Michele M. Vercoski [Bar No. 244010]
mmv@mccunelawgroup.com
Yasmin N. Younessi [Bar No. 331327]
ynv@mccunelawgroup.com
Gavin P. Kassel [Bar No. 284666]
sboffice@mccunelawgroup.com
**MCCUNE LAW GROUP, APC**
18565 Jamboree Road, Ste. 550
Irvine, CA 92612
Telephone: (909) 557-1250
Facsimile: (909) 557-1275

Attorneys for Plaintiffs
TRISHA MALONE, JASON ARBALLO,
STACY HORNE, and MONICA GONZALEZ

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA (Southern Division - Santa Ana)

| | |
|---|---|
| TRISHA MALONE, JASON ARBALLO, STACY HORNE, and MONICA GONZALEZ, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>WALT DISNEY PARKS AND RESORTS U.S., INC.; INSPIRE HEALTH ALLIANCE, LLC., DOES 1 through 5, DOES 6-10 inclusive,<br><br>Defendants. | Case No.: **8:25-cv-00562-SRM-DFM**<br><br>**NOTICE OF FILING FIRST AMENDED COMPLAINT**<br>RE: DEFENDANTS' MOTION TO DISMISS (DKT. NO. 18) |

TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that pursuant to Federal Rule of Civil Procedure 15(a)(1)(B), Plaintiffs have timely filed a First Amended Complaint in response to Defendants' Motion to Dismiss (Dkt. No. 18). The First Amended Complaint was filed as a matter of course within 21 days of service of the motion.

As a result, Defendants' pending Motion to Dismiss (Dkt. No. 18) should be rendered moot.

DATED: April 7, 2025,                    Respectfully submitted,


                                         **MCCUNE LAW GROUP, APC**


                                         By:      *Gavin P. Kassel*
                                         _____
                                         Michele M. Vercoski
                                         Yasmin N. Younessi
                                         Gavin P. Kassel
                                         Attorneys for Plaintiffs

Michele M. Vercoski [Bar No. 244010]
mmv@mccunelawgroup.com
Yasmin N. Younessi [Bar No. 331327]
ynv@mccunelawgroup.com
Gavin P. Kassel [Bar No. 284666]
sboffice@mccunelawgroup.com
**MCCUNE LAW GROUP, APC**
18565 Jamboree Road, Ste. 550
Irvine, CA  92612
Telephone: (909) 557-1250
Facsimile: (909) 557-1275

Attorneys for Plaintiffs
TRISHA MALONE, JASON ARBALLO,
STACY HORNE, and MONICA GONZALEZ

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA (Southern Division - Santa Ana)**

| | |
|---|---|
| TRISHA MALONE, JASON ARBALLO, STACY HORNE, and MONICA GONZALEZ, individually and on behalf of all others similarly situated,<br><br>            Plaintiffs,<br><br>   v.<br><br>WALT DISNEY PARKS AND RESORTS U.S., INC.; INSPIRE HEALTH ALLIANCE, LLC., DOES 1 through 5, DOES 6 through 10, inclusive,<br><br>           Defendants. | Case No.: **8:25-cv-00562-SRM-DFM**<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES** |

Plaintiffs, TRISHA MALONE, STACY HORNE, JASON ARBALLO, and MONICA GONZALEZ, individually and in their representative capacities, allege as follows:

## INTRODUCTION

1.      This action challenges discriminatory practices by Walt Disney Parks and Resorts U.S., Inc. ("Disney") in its administration of the Disability Access Service (DAS) program, particularly the imposition of blanket restrictions that deny guests with cognitive and developmental disabilities the reasonable and necessary accommodation of return access to attractions, in violation of Title III of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12182, and related state law.

## JURISDICTION

2.      Plaintiff, Trisha Malone, originally filed this action in the Superior Court of the State of California, County of Orange. Defendant Walt Disney Parks and Resorts U.S., Inc. subsequently removed this action to the United States District Court for the Central District of California, invoking federal question jurisdiction under 28 U.S.C. §§ 1331 and 1441. Specifically, Defendants asserted that Plaintiff's claims arise under federal law, including violations of the Americans with Disabilities Act (42 U.S.C. § 12182). Plaintiff disputes the propriety of this removal and expressly preserves their right to seek remand back to state court. Plaintiffs' file this Amended Complaint pursuant to Federal Rule of Civil Procedure 15(a)(2), without waiving their objections to federal jurisdiction or removal.

## PARTIES

3.      Plaintiffs' Trisha Malone, Stacy Horne, Jason Arballo, and Monica Gonzalez are individuals with disabilities as defined under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq., incorporated by the Unruh Civil Rights Act, Cal. Civ. Code § 51 et seq., and the California Fair Employment and Housing Act (FEHA).

4.      Plaintiff, Trisha Malone, is a physically disabled citizen of San Diego, California, who purchased a Magic Key. Ms. Malone represents all consumer guests who purchased a Magic Key pass, applied for DAS on or after June 18, 2024, Disneyland Park and/or Disney California Adventure Park, were required by Defendants to accept DAS terms, were subsequently denied DAS, and disclosed private medical information.

5.      Plaintiff, Stacy Horne, is a physically disabled resident of Circle Camarillo, California, who also purchased a Magic Key. Ms. Horne, represents consumer guests who purchased a Magic Key pass, applied for DAS on or after June 18, 2024, Disneyland Park and/or Disney California Adventure Park, were required by Defendants to accept DAS terms and disclosed private medical information during their DAS interview.

6.      Plaintiff, Jason Arballo, is a physically and mentally disabled military veteran residing in Salt Lake City, Utah, who purchased a day pass. Represents consumer guests who purchased a day pass, applied for DAS on or after June 18, 2024, Disneyland Park and/or Disney California Adventure Park, were required by Defendants to accept DAS terms and disclosed private medical information during their DAS interview.

7.      Plaintiff, Monica Gonzalez, is a physically disabled resident of Huntington Park, California, employed by Walt Disney Parks and Resorts U.S., Inc. Plaintiff Gonzalez is informed and believes, and thereon alleges, that WDPR acted as an employer to Plaintiff Gonzalez and the Disney employee class members and exercised control over the policies and practices challenged herein. Ms. Gonzalez represents disabled WDPR employees that reside in California, applied for DAS on or after June 18, 2024, Disneyland Park and/or Disney California Adventure Park, and were required to accept WDPR's DAS terms before interviewing for DAS.  Labor Code, and Business and Professions Code 17200 et. seq.

8.      Defendant Walt Disney Parks and Resorts U.S., Inc. ("WDPR" or "Disney") is a Delaware corporation operating Disneyland Resort and California Adventure Park in Anaheim, California. WDPR owns and operates Disneyland Resort and California Adventure in Anaheim, California, which qualify as places of public and employment accommodations under the Unruh Act and FEHA. Defendant, WDPR, employs or employed these class members, providing them with park passes as part of their employment benefits. They were denied Disability Access Service ("DAS") through the same screening process and criteria as consumer guests with day passes or magic key passes, despite their disabilities that prevent them from waiting in conventional queues. This is alleged to be a violation of FEHA's rules against disability discrimination and failure to provide reasonable accommodations.

9.      Defendant Inspire Health Alliance, LLC (hereinafter referred also as "Inspire Health," "Inspire Health Alliance," and "Inspire") is a healthcare provider incorporated in Bradenton, Florida, with one of their managing members being a citizen of Utah contracted by WDPR to conduct medical screenings and assess the eligibility of guests seeking DAS accommodations.

10.     DOES 1 through 5 are individuals or entities affiliated with WDPR whose identities are currently unknown but whose actions contributed to the alleged discriminatory and unlawful conduct described in this complaint.

11.     DOES 6 through 10 are individuals or entities affiliated with Inspire Health Alliance whose identities are currently unknown but who directly or indirectly participated in the alleged violations of law, including the improper collection, disclosure, and handling of confidential medical information.

## CLASS ALLEGATIONS

12.     Plaintiffs bring this action on behalf of themselves, and all others similarly situated pursuant to California Code of Civil Procedure § 382. This action challenges Defendants' systemic policies and practices related to the Disability

4

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES
CASE NO. 8:25-cv-00562-SRM-DFM

Access Service (DAS) implemented on or after June 18, 2024. The following proposed Classes and subclasses share common questions of law and fact:

a.    Consumer Guest Class (Represented by Plaintiffs Malone, Horne, and Arballo): All guests who applied for DAS since June 18, 2024, were required to accept Disney's Terms and Conditions, and who disclosed private medical information during the application process.

b.    Disabled Disney Employees that Applied for DAS Subclass (Represented by Plaintiff Gonzalez): All current and former disabled Disney employees residing in California who were provided theme park admission passes by Defendants WDPR and Does 1 through 5 as a benefit of employment, applied for DAS on or after June 18, 2024 for Disneyland Park and/or Disney California Adventure Park, and were required by Defendants WDPR to accept DAS terms to interview for the DAS accommodation. These disabled individuals encompass Disney employee guests particularly those affected by the limitation of DAS intended only for individuals with developmental disabilities, such as autism. Membership in this includes individuals who were required by to accept specific DAS Terms and Conditions as part of the application process, which Plaintiffs allege contained unlawful provisions, including a purported class action waiver imposed only on disabled individuals seeking accommodation, unlike non-disabled guests.

c.    Disabled Consumers that Applied for DAS Subclass (Represented by Plaintiff Malone): All disabled consumer who applied for the Disability Access Service (DAS) at Disneyland Park and/or Disney California Adventure Park on or after June 18, 2024, and were denied access based on WDPR's discriminatory eligibility criteria, policies, or practices. These disabled individuals encompass consumer guests particularly those affected by the limitation of DAS intended only for individuals with developmental disabilities, such as autism. Membership in this class includes individuals who were required

by to accept specific DAS Terms and Conditions as part of the application process, which Plaintiffs allege contained unlawful provisions, including a purported class action waiver imposed only on disabled individuals seeking accommodation, unlike non-disabled guests.

d.    Privacy Violation Subclass (Represented by Plaintiffs Malone, Horne, and Arballo): All consumer guests who applied for WDPR's Disability Access Service (DAS) for use at Disneyland Park and/or Disney California Adventure Park on or after June 18, 2024, spoke with both an Inspire Health Alliance nurse practitioner and WDPR cast member, and were subjected to one or more of the following practices by Defendants WDPR and/or its agent (e.g., Inspire Health Alliance) that violated their rights under the California Confidentiality of Medical Information Act (CMIA) and/or their California constitutional and common law right to privacy:

i. Being required, during the DAS application or interview process (whether in-person or via remote video call), to disclose sensitive personal medical information regarding their disability in a non-confidential setting where such information was subject to foreseeable and actual unauthorized disclosure to third parties (such as other guests or uninvolved WDPR employees); and/or

ii. Having their identifiable disability category selection collected and stored electronically by WDPR via its online application chatbot without adequate disclosures regarding data security or HIPAA compliance; and/or

iii. Following difficulties, denials, or inadequate responses during the primary DAS application process, being directed by WDPR personnel, or feeling compelled by the circumstances created by WDPR, to transmit detailed sensitive personal medical information via email to WDPR-controlled addresses (such as disability.services@WDPRland.com

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES
CASE NO. 8:25-cv-00562-SRM-DFM

or executive emails). Plaintiffs Malone, Arballo, and Horne, for example, sent such emails containing identifiable information along with specific details about their respective medical conditions (including severe allergies, service-connected cognitive/neurological conditions, multiple autoimmune disorders), symptoms, limitations, medical histories, and disability statuses to justify their need for DAS. This solicitation, receipt, and electronic storage of detailed medical information via inherently non-secure email, without adequate security safeguards, warnings against such transmission, or proper authorization under CMIA, constitutes a violation included within this subclass.

e.    Unconscionable & Deceptive Terms Subclass (Represented by Plaintiffs Malone, Horne, Arballo, and Gonzalez): All consumer and employee guests who applied for Disability Access Service (DAS) for use at Disneyland Park and/or Disney California Adventure Park on or after June 18, 2024, and, as a prerequisite to initiating or completing the DAS application or interview process, were required by Defendant WDPR to agree to its DAS Terms and Conditions which contained allegedly unlawful, unfair, deceptive, and/or unconscionable provisions, including but not limited to, a naked class action waiver presented without reference to or inclusion of an arbitration agreement within those specific terms, in violation of the Consumer Legal Remedies Act (CLRA) and/or California Business and Professions Code § 17200.

13.    **Numerosity**: The members of the class are so numerous that joinder of all members is impracticable.

14.    **Commonality**: Common questions of law and fact include:

a.  Whether Defendants WDPR and Does 1-5s' DAS eligibility criteria violate the Unruh Act and FEHA;

b.  Whether Defendants and Does 1-5 negligently or intentionally disclosed guests' PHI in violation of HIPAA guidelines and state confidentiality laws;

c.  Whether all Defendants improperly compelled disclosure of confidential medical information in violation of the California Confidentiality of Medical Information Act;

d.  Whether Defendants WDPR and Does 1-5s' terms and conditions are unfair or unconscionable under California law.

15.  Adequacy of Representation: The plaintiff's counsel is an adequate representative of the Classes that Plaintiff seeks to represent. They will fairly protect the interests of the Class members without any conflicting interests. The class counsel will vigorously pursue this lawsuit with attorneys who are competent, skilled, and experienced in handling similar legal matters. The class counsel representing the Representative Plaintiff is both competent and experienced.

## **FACTUAL ALLEGATIONS**

16.  On or after June 18, 2024, Plaintiffs Trisha Malone, Jason Arballo, Stacy Horne, and other disabled consumer subclass members applied for WDPR's DAS accommodation through various methods required by WDPR, including in-person interviews at Disneyland Resort guest relations locations (used by Plaintiffs Malone and Arballo) and remote video calls (used by Plaintiff Horne). As a mandatory prerequisite for consideration for the DAS accommodation, Defendant WDPR, directly and/or through its contracted agent Inspire Health Alliance, compelled Plaintiffs and other disabled consumer subclass members to verbally disclose specific, sensitive personal medical information regarding their disabilities, symptoms, and functional limitations affecting their ability to wait in conventional queues.

17.  These compelled disclosures frequently occurred in non-confidential settings – such as open guest relations counters within earshot of other guests and

8

uninvolved employees, or via video calls where privacy could not be ensured – environments not conducive to the discussion of private health information. Plaintiffs and other disabled consumer class members did not voluntarily waive their rights to privacy; rather, they disclosed this sensitive information under duress as the only means provided by WDPR to potentially obtain a necessary accommodation.

18.    This process stood in stark contrast to the appropriate, confidential, HIPAA-compliant methods through which Plaintiffs were willing and able to provide medical verification, had WDPR offered such an alternative. The compelled discussion of details concerning recognized medical disabilities in non-private settings constitutes a violation of Plaintiffs' and other disabled consumer class members' privacy rights under California law.

19.    The DAS application process implemented by Defendant WDPR required Plaintiffs Malone, Arballo, Horne, and other disabled consumer class members to undergo interviews, often conducted jointly by WDPR cast members and nurse practitioners from Defendant Inspire Health Alliance, acting as WDPR's agent.   Upon information and belief, these interviews, whether conducted in person at guest relations locations or remotely via video call, frequently took place in non-confidential settings lacking adequate privacy safeguards, where conversations could be easily overheard by other guests or uninvolved WDPR personnel. During these interviews, Plaintiffs and other disabled consumer class members were subjected to probing questions (including those examples previously cited) specifically designed by WDPR and/or Inspire to elicit detailed sensitive personal medical information.

20.    In order to justify their need for the DAS accommodation under WDPR's process, Plaintiffs were compelled to disclose details constituting "medical information" under CMIA, Cal. Civ. Code § 56.05(j), including, but not limited to, the nature of their disabilities, specific symptoms, triggers, the severity

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES
CASE NO. 8:25-cv-00562-SRM-DFM

and manifestations of their conditions, and functional limitations directly resulting from their medical status. These compelled verbal disclosures of highly personal and sensitive medical details occurred without appropriate privacy protections and created a significant risk of unauthorized disclosure to third parties, directly violating the privacy rights of Plaintiffs and other disabled consumer class members under CMIA and California law.

21.    Defendants WDPR and Does 1-5 own and operates Disneyland and California Adventures in Anaheim California, which qualifies as a place of public accommodation as defined under the ADA, 42 U.S.C. § 12181(7). To accommodate guests whose disability prevent them from waiting in a conventional queue for an extended period, Defendant WDPR provided a Disability Access Service ("DAS").

22.    Based on information and belief, on or about June 18, 2024, Defendants WDPR and Does 1-5 implemented modifications to its DAS policy, including changes to the eligibility criteria and the application process for the service. Under the revised policy, Defendants WDPR and each of them restricted DAS accommodations to guests who, due to a developmental disability such as autism or a similar condition, were unable to wait in a conventional queue for an extended period. WDPR stated that DAS was designed to serve only a small percentage of guests with such disabilities, with eligibility determined based on specific and narrowly defined criteria established by WDPR.

23.    On July 14, 2024, Plaintiff Trisha Malone applied in person for DAS and spoke with both a WDPR cast member and an Inspire Health Alliance nurse practitioner.  When asked about the reason behind her inability to wait in standard lines, Ms. Malone could only provide a detailed explanation of her severe, airborne anaphylactic allergy to latex. Both WDPR's cast member, and the Inspire Health Alliance nurse practitioner's questions compelled Ms. Malone to provide detailed medical history about her latex allergy. Ms. Malone publicly explained that even

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES
CASE NO. 8:25-cv-00562-SRM-DFM

exposure to tiny latex particles, commonly found on items like balloons, could cause her throat to close and potentially lead to death in a confined space. She also disclosed that her daughter shares the same life-threatening allergy and provided detailed information about their conditions, accompanied by Ms. Malone.

24.    Ultimately, WDPR and Inspire Health's medical professional jointly applied WDPR's updated DAS criteria to determine that Ms. Malone did not qualify for DAS. Inspire Health's medical professionals previously trained WDPR's cast members to evaluate Ms. Malone and other disabled class member's medical information to determine if they had a developmental disability like autism and were eligible for DAS. Furthermore, Inspire Health Alliance's nurse practitioner concluded that Ms. Malone and other disabled class members did not meet the criteria for DAS based on a reasonable degree of medical probability. This determination was made after assessing whether she and others had a developmental disability, such as autism.  At this point, WDPR and the nurse practitioner explained other alternative accommodations after evaluating Ms. Malone's latex allergy and she not qualifying for receiving the DAS accommodation.

25.    After expressing agitation, WDPR advised Ms. Malone and other disabled consumer class members who were denied DAS to email their concerns and explain how their disability prevented them from waiting in line. However, neither WDPR's cast members nor Inspire Health Alliance's nurse practitioners advised Ms. Malone or any other disabled consumer class members not to disclose private sensitive medical information, such as medical conditions and history, in their written correspondences to WDPR.

26.    As a result, Ms. Malone and other disabled consumer class members who faced denials or significant challenges with the DAS application process directly documented sensitive details in written correspondence to WDPR executives and relevant departments. For instance, Plaintiff Trisha Malone, after

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES
CASE NO. 8:25-cv-00562-SRM-DFM

being denied DAS in person despite explaining her private life-threatening disability. Ms. Malone sent this email on or about July 22, 2024, directly to numerous high-level WDPR executives, including WDPR's CEO Robert Iger and presidents of relevant park divisions.

27.    Plaintiff Jason Arballo is a physically and mentally disabled military veteran with service-connected disabilities impacting neurological function, memory, and stress responses, who had successfully obtained and utilized a DAS pass without issue during a park visit in May 2024. However, when he attempted to obtain a DAS pass in person on or around August 9, 2024, he endured a distressing and lengthy interview process that lasted approximately 40 minutes. This interview was conducted jointly by a WDPR cast member and an Inspire Health Alliance nurse practitioner in a public setting. Mr. Arballo spoke with both a WDPR cast member and an Inspire Health Alliance nurse practitioner. Mr. Arballo was first asked why he could not wait in a standard line.

28.    At that point, Mr. Arballo couldn't think of anything else but to disclose his medical history arising from his traumatic brain injury and PTSD as a result of his military service. He explained that he has been 100% service connected to the VA for these disabilities, which prevented him from waiting in long lines. Neither the cast member nor the Inspire Health alliance did stop or guide Mr. Arballo from not publicly disclosing this sensitive private medical information in a public setting. Instead, their questions prompted him to provide this specific detail. In reality, there was no way Mr. Arballo or any disabled consumer class member could answer the cast members and nurse practitioners' questions without disclosing medical information, including medical history and the treatment related to a person's disability.

29.    Mr. Arballo also faced repetitive and confusing questioning, including highly intrusive and personal inquiries regarding basic self-care abilities (such as bathroom use and feeding himself). His wife and caregiver attempted to explain to

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES
CASE NO. 8:25-cv-00562-SRM-DFM

the interviewers that Mr. Arballo experiences confusion and memory loss due to his service-connected conditions and would struggle with the intense questioning, but the probing continued. The reason provided for the denial, upon information and belief, was not related to his functional limitations but was the arbitrary and discriminatory assertion that he did not qualify because he "wasn't born with his disability," demonstrating WDPR's rigid adherence to its narrow criteria focused on developmental disabilities.

30.    Similar to Ms. Malone and other disabled consumer class members, WDPR instructed Mr. Arballo to email his concerns and explain how his disability hindered his ability to wait in lines. As per the instructions, Mr. Arballo sent an email to WDPR's Guest Services on or around August 9, 2024. In his email, he described his service-connected disabilities that affect his neurological function, memory, and stress responses. He explained why these impairments make waiting in conventional queues extremely challenging for him.

31.    On or about July 10, 2024, Plaintiff Stacy Horne applied online via video chat for DAS. A WDPR cast member and an Inspire Health Alliance nurse practitioner both jointly evaluated Mr. Horne in the same room. Both a WDPR cast member and an Inspire Health Alliance nurse practitioner asked the same or similar set of questions to Ms. Horne, as well as to other disabled consumer members such as Mr. Arballo and Ms. Malone. These questions included:

- What are your concerns about waiting in a standard queue?
- What accommodations do you use at work? How do you manage lines at the grocery store? The airport? The DMV? The Post Office? When in traffic?
- What accommodations do you have at home?
- What tools or techniques do you use to manage when waiting in lines?
- How do you manage drive-throughs?

13

- If I was standing behind you in line, what might I see?
- What does a "meltdown" look like for you?
- You have had DAS before, how has DAS helped you in the past?
- How do you manage the lines in the park for popcorn?

32.     Ms. Horne, like Plaintiffs Ms. Malone, Mr. Arballo, and other disabled consumer class members, felt compelled to disclose her medical history and treatments for Lupus, Sjogren's, Hashimoto's, Chronic Fatigue Syndrome disabilities to explain how it affected her ability to wait in long lines.

33.     Furthermore, during this video chat Mr. Horne could overhear other cast members, and nurse practitioners' discussions with other guests. However, similar to other disabled consumer class members, WDPR and Inspire Health Alliance informed Ms. Horne that she did not meet the criteria for the DAS accommodation under WDPR's revised guidelines, which WDPR had intended to reserve for individuals with developmental disabilities such as autism. Additionally, like the other Plaintiffs and other disabled consumer class members, WDPR advised Ms. Horne to email her concerns and explain why her disability prevented her from waiting in long lines. Furthermore, neither WDPR nor Inspire Health Alliance provided any disclaimer to not to send any medical information, including treatment or medical history related to her disability to WDPR.

34.     As instructed by WDPR, Ms. Horne emailed WDPR's Disability Services on or about July 10, 2024, specifically explaining her inability to wait in queues due to multiple autoimmune disorders (including Lupus, Sjogren's, Hashimoto's, Chronic Fatigue Syndrome) causing severe fatigue, joint pain, sun sensitivity, and lung involvement, and mentioning her status as a Social Security Disability recipient based on these conditions, offering doctor's notes as proof.

35.     These emails from Ms. Horne, sent to WDPR, provided her name, addresses, and contained other identifying information alongside detailed descriptions of her specific medical information, including symptoms, histories,

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES
CASE NO. 8:25-cv-00562-SRM-DFM

functional limitations, and disability statuses provided solely to justify the need for the DAS accommodation. Plaintiffs Ms. Malone, Mr. Arballo, and other class members that were denied DAS sent similar emails to WDPR following WDPR's advice to do so.

36.     Plaintiff Monica Gonzalez is a currently employed cast member of Defendants WDPR and Does 1 through 5, having been employed during the periods of on or about December 5, 2014, to March 2017, about September 2017 to around February 5, 2018, and around February 3, 2022, through the present. As a benefit of employment, WDPR and DOES 1 THROUGH 5 provided Ms. Gonzalez and other employees of theme park admission passes as a benefit of employment. Ms. Gonzalez suffers from Multiple Sclerosis (MS), a disability which substantially limits major life activities. Her condition causes significant symptoms, including, but not limited to, brain fog, difficulty retaining purely verbal information, and challenges with concentration and distraction, particularly in stimulating environments. These symptoms make waiting for extended periods in conventional, often crowded and overstimulating, theme park queues functionally impossible and medically inadvisable for Ms. Gonzalez. On or about August 21, 2024, Ms. Gonzalez applied for the DAS accommodation due to her disability-related inability to wait in a conventional queue.

37.     Despite her qualifying disability and need for accommodation to utilize her employment benefit, Defendants WDPR and DOES 1 THROUGH 5 denied her application for DAS under their revised, restrictive criteria that DAS was intended only for those with developmental disabilities like autism. Ms. Gonzalez attempted to apply for DAS again on or about April 1, 2025, and once again was denied the accommodation.

38.     Defendant WDPR's revised eligibility criteria for DAS, which narrowly focus on accommodating guests with specific developmental disabilities like autism, violate the fundamental principles of the ADA and the Unruh Civil

Rights Act. The ADA mandates that "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation..." (42 U.S.C. § 12182(a)). It is contrary to this mandate for WDPR to unilaterally declare that DAS, which addresses the functional limitation of inability to wait in conventional queues, is "intended" for only one subset of disabilities.

39.    Accommodations under the ADA must address functional needs, not preferred diagnostic labels chosen by the business; WDPR's approach is akin to unlawfully limiting accessible parking solely to wheelchair users or service animals solely to the visually impaired. Such criteria constitute discriminatory "standards or criteria or methods of administration" that "have the effect of discriminating on the basis of disability" (42 U.S.C. § 12182(b)(1)(D)(i)).

40.    Upon Plaintiffs and each of the class members' information and belief, this restrictive application serves an improper financial motive for WDPR. Specifically, guests utilizing DAS return times are directed into the "Lightning Lane" queues, the same expedited queues accessed by non-disabled guests who purchase WDPR's paid "Genie+" service and individual Lightning Lane passes. By artificially and unlawfully restricting the number of guests eligible for the free DAS accommodation—through narrow criteria and an allegedly difficult application process even for those with developmental disabilities—Defendant WDPR reduces usage of Lightning Lanes by non-paying disabled guests and increases the queue capacity and incentive for non-disabled guests (and potentially disabled guests denied DAS but still unable to wait in standard queues) to purchase paid Lightning Lane access, thereby boosting its revenue. Prioritizing paid access over legally required accommodations constitutes an unlawful and discriminatory administrative method and business practice.

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES
CASE NO. 8:25-cv-00562-SRM-DFM

41.    The practical consequence of Defendant WDPR's unlawful restriction of DAS and its simultaneous offering of ineffective alternative accommodations directly harms disabled guests financially and underscores the discriminatory nature of its practices. Plaintiffs and similar consumer and employee class members allege that guests with disabilities were denied the necessary DAS accommodations due to WDPR's discriminatory criteria. They found WDPR's purported alternatives, such as Queue Re-Entry or Rider Switch, unworkable, unsafe, or unduly burdensome for their specific disabilities. Consequently, these guests were left with no functional means to access many popular park attractions without waiting in conventional queues, an option for their disabilities prevent them from using.

42.    Faced with the unacceptable choice of either forgoing numerous attractions entirely or finding a way to bypass the standard queues, disabled guests like Mr. Arballo were effectively compelled to purchase WDPR's paid "Genie+" service and/or individual Lightning Lane passes for themselves and their families. In essence, Defendant WDPR forced disabled guests like Mr. Arballo and other similar consumer and employee class members to pay a premium for queue access simply to achieve a semblance of the park experience readily available to non-disabled guests. This practice transforms a legally required disability accommodation into a revenue-generating product, further demonstrating the discriminatory impact of the revised DAS policy and constituting an unfair and unlawful business practice that leverages guests' disabilities for financial gain.

43.    By applying these improperly restrictive criteria, potentially driven by financial incentives over legal obligations, WDPR and DOES 1 THROUGH 5 subjects Plaintiffs Malone, Arballo, Horne, Gonzalez and other disabled consumers and employee class members, to unlawful discrimination. WDPR denies them the "opportunity... to participate in or benefit from" the DAS accommodation (§ 12182(b)(1)(A)(i)); affords them an opportunity to benefit from the park that is

17

"not equal to that afforded to other individuals" (§ 12182(b)(1)(A)(ii)); provides a "different or separate" accommodation (DAS for some, less effective alternatives or paid Lightning Lane for others) that is not "as effective as that provided to others" needing the same functional modification (§ 12182(b)(1)(A)(iii)); and potentially forces them into less integrated settings (§ 12182(b)(1)(B)).

44.    WDPR and DOES 1 THROUGH 5's attempt to limit DAS based on disability type, potentially to enhance revenue from paid services using the same queue infrastructure, is a discriminatory barrier contrary to the ADA and the Unruh Act.

45.    Furthermore, Defendants WDPR and Does 1-5's Terms and Conditions expressly state that:

> **"The Disability Access Service (DAS) is intended to accommodate only Guests who, due to a developmental disability like autism or similar, are unable to wait in a conventional queue for an extended period of time."**

46.    The Unruh Act incorporates the Americans with Disabilities Act (ADA), including its prohibition on eligibility criteria that tend to screen out individuals with disabilities. Under 42 U.S.C. § 12182(b)(2)(i), it is unlawful for a business to impose eligibility criteria that "*screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any goods, services, facilities, privileges, advantages, or accommodations, unless such criteria can be shown to be necessary.*"

47.    WDPR and DOES 1 THROUGH 5 unlawfully excluded individuals with disabilities, except for some individuals they deemed to have developmental disabilities, from DAS accommodations. In fact, WDPR and DOES 1 THROUGH 5 denied DAS to those who have developmental disabilities like autism, showcasing their new policy excluded individuals like Plaintiffs Ms. Malone, Mr.

18

Arballo, Ms. Horne, Gonzalez, and other disabled consumer and employee guests, from equally enjoying the parks.

48.    Furthermore, the DAS Terms and Conditions imposed by Defendant WDPR contain other unlawful and unconscionable provisions, most notably an unenforceable naked class action waiver. This provision was coercively imposed upon Plaintiffs Malone, Arballo, Horne, and other consumer class members as a non-negotiable precondition to even apply for the necessary DAS accommodation.

49.    The waiver purports to strip disabled consumers of their right to participate in class or representative actions seeking redress for WDPR's alleged systemic violations of law. However, the Consumer Legal Remedies Act explicitly states: "Any waiver by a consumer of the provisions of this title is contrary to public policy and shall be unenforceable and void." (Cal. Civ. Code § 1751). As Plaintiffs Malone, Arballo, Horne, and other consumer class members are "consumers" under the CLRA acquiring services from WDPR, this mandatory class action waiver, which attempts to waive consumers' rights to pursue remedies under the CLRA (including class-wide relief for violations of § 1770 such as the deceptive omissions and unconscionable terms alleged herein), is statutorily void and unenforceable as contrary to express public policy under § 1751.

50.    Moreover, the waiver provided no alternative dispute resolution mechanism (such as arbitration), served solely to improperly shield WDPR from accountability for its alleged misconduct, separately violates the Unruh Civil Rights Act (by imposing an unlawful eligibility criterion), constitutes an unfair and unlawful business practice under the UCL, and violates employee right FEHA and the California Labor Code. The combination of deceptive omissions regarding the interview process (as alleged above) and the inclusion of coercive, unlawful terms—such as the void class action waiver—renders the entire DAS Terms and Conditions agreement suspect and its waiver provision unenforceable.

51.     Defendant WDPR's mandatory DAS Terms and Conditions, which Plaintiffs Malone, Arballo, Horne, Gonzalez, and other disabled employee and consumer class members were required to accept before even initiating the DAS interview process, were themselves deceptive and constitute an unfair and unlawful business practice. Plaintiffs allege these Terms intentionally failed to disclose material information about the subsequent application process, thereby procuring consent under false pretenses.

52.     Specifically, the Terms failed to inform guests that they might be required to interact with and disclose sensitive personal medical information to a third-party entity, Inspire Health Alliance, employing medical professionals (nurse practitioners). The Terms also omitted the material purpose of this interaction: that Inspire Health Alliance, acted as WDPR's agent, would use the elicited medical information to perform a medically based evaluation essential to determining if the guest fit within WDPR's narrow, predetermined eligibility criteria (i.e., having a "developmental disability like autism or similar"). Upon information and belief,

53.     Inspire Health Alliance also guided and trained WDPR cast members, enabling them to work jointly with Inspire's nurse practitioners to effectively screen, and in essence diagnose, whether guests met WDPR's restrictive definition. WDPR's intentional failure to disclose the critical role of this third-party medical evaluator and the true nature of the impending quasi-medical assessment within the Terms presented upfront constitutes a deceptive omission under the CLRA and UCL.

54.     Furthermore, with respect to Plaintiff Monica Gonzalez and the employee Subclass, Defendants' WDPR and DOES 1 THROUGH 5's imposition of the DAS Terms and Conditions, containing the purported class and representative action waiver, constitutes a violation of California Labor Code section 432.6 and, consequently, an unlawful employment practice under FEHA pursuant to California Government Code section 12953. Defendants required

Plaintiff Gonzalez and other disabled employee class members to agree to these
terms, including the waiver of their right to bring class or representative actions
under FEHA, as a mandatory condition of applying for the DAS accommodation.

55.    This accommodation was necessary for them to meaningfully access
and receive the full employment benefit of their complimentary theme park
admission passes provided by Defendants WDPR and DOES 1 THROUGH 5.
Labor Code section 432.6 expressly prohibits an employer from requiring an
employee, as a "receipt of any employment-related benefit," to waive any right,
forum, or procedure for a violation of FEHA, including the right to file and pursue
a court action.

56.    Thus, the theme park admission passes constitute an employment-
related benefit, and the DAS service functions as a necessary accommodation
required by certain disabled employees, like Plaintiff Gonzalez and the employee
class members, to equally access and enjoy that benefit. Critically, the DAS Terms
and Conditions containing this waiver do not include any agreement to arbitrate
disputes. Because these specific terms lack any provision for arbitration, the waiver
contained therein is not governed or preempted by the Federal Arbitration Act
(FAA) and stands in direct violation of California Labor Code section 432.6 and
FEHA.

57.    Defendants WDPR and Does 1-5's DAS Terms and Conditions
deceptively required guests to agree that:

> *"[A]ny lawsuit I may file, or participate in, challenging this*
> *decision, the individualized discussion, or the overall process*
> *itself, shall be conducted only on an individual basis and not*
> *as a plaintiff or class member in a purported class, consolidated*
> *or representative   action or proceeding."*

58.    Furthermore, the waiver is fatally vague and ambiguous, as it fails to
clearly identify the specific entity or entities against whom rights are purportedly
waived, nor does it mention third parties like Inspire Health Alliance, rendering its

21

scope uncertain and contributing to its unconscionability. This void waiver also provided no alternative dispute resolution mechanism (like arbitration), constitutes an unlawful eligibility criterion, and serves only to improperly shield WDPR and potentially its agents from accountability for the systemic violations alleged herein, further violating the UCL, Labor Code, FEHA, and California public policy favoring access to justice for civil rights and consumer protection claims.

59. The Unruh Civil Rights Act prohibits discrimination based on disability and incorporates the Americans with Disabilities Act (ADA), which bars the imposition of eligibility criteria that tend to screen out individuals with disabilities. Under 42 U.S.C. § 12182(b)(2)(i):

> ***"Discrimination includes the imposition or application of eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any goods, services, facilities, privileges, advantages, or accommodations, unless such criteria can be shown to be necessary for the provision of the goods, services, facilities, privileges, advantages, or accommodations being offered."***

60. By implementing and applying revised eligibility criteria—allegedly in concert with its agent, Defendant Inspire Health Alliance—that restrict DAS only to individuals based on the *type* of their disability (such as specific developmental disabilities like autism) rather than their demonstrated *functional inability* to wait in conventional queues due to *any* qualifying disability, Defendant WDPR and Does 1-50 have imposed standards that unlawfully screen out Plaintiffs Malone, Arballo, Horne, Gonzalez and other disabled consumer and employee class members. WDPR's DAS criteria expressly excludes individuals with disabilities such as physical, cognitive, sensory, environmental sensitivity, and other impairments. Disabled guests like Plaintiffs and other class members cannot safely or comfortably wait in standard queues and face denial of the necessary

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES
CASE NO. 8:25-cv-00562-SRM-DFM

DAS accommodation because WDPR's preferred diagnostic category arbitrarily excludes their specific disabilities.

61.    This practice prevents Plaintiffs Malone, Arballo, Horne, Gonzalez and the disabled consumer and employee class from fully and equally benefiting from the DAS privilege and advantage. Consequently, it denies them equal access to public park attractions enjoyed by non-disabled consumer and employee guests as WDPR and/or Inspire Health Alliance determine which guests have developmental disabilities, such as autism, to meet WDPR's intended restrictive criteria. These criteria constitute impermissible eligibility standards that "screen out or tend to screen out... a class of individuals with disabilities" from equally enjoying WDPR's accommodations, directly violating the Unruh Civil Rights Act, the incorporated provisions of the ADA, 42 U.S.C. § 12182(b)(2)(A)(i), and FEHA. They also function as discriminatory "standards or criteria or methods of administration" having the effect of discriminating based on disability type under 42 U.S.C. § 12182(b)(1)(D)(i). Imposing these additional, unlawful barriers based on disability type subjects Plaintiffs and the class of disabled consumers and employees to discriminatory treatment expressly prohibited by the Unruh Act and FEHA.

62.    Further, the following provision states WDPR and Does 1-5 can unilaterally modify the terms without notice further exacerbates the discriminatory impact. The terms state:

> ***"The company reserves the right to change the Terms and Conditions of this service without notice, at which time you will need to accept the updated Terms and Conditions."***

63.    These terms unfairly exploit the significant power imbalance between WDPR and disabled consumer and employee guests like Plaintiffs Malone, Arballo, Horne, Gonzalez who WDPR required the DAS accommodation for equal access to attractions as non-disabled guests. The inclusion of the unenforceable

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES
CASE NO. 8:25-cv-00562-SRM-DFM

naked class action waiver, imposed coercively as a precondition to applying for DAS and presented without any alternative dispute resolution mechanism such as arbitration, exemplifies this unfairness.

64.    By attempting to strip disabled individuals—a protected class particularly reliant on collective action to address systemic discrimination—of their right to participate in class or representative actions, WDPR unfairly leverages its dominant position to shield itself from accountability, leaving vulnerable individuals without a meaningful avenue to challenge widespread issues like the discriminatory screening criteria or privacy violations alleged herein. This practice is also unlawful under § 17200 as it incorporates a waiver rendered void by Cal. Civ. Code § 1751 and constitutes an impermissible eligibility criterion under the Unruh Act.

65.    Furthermore, the provision granting WDPR the unilateral right to change the Terms and Conditions "without notice," forcing disabled guests to accept updated terms on demand, exacerbates the unfairness and discriminatory impact by subjecting disabled guests seeking essential, ongoing access accommodations to arbitrary and unpredictable rule changes, further cementing the exploitative power dynamic. Notably, non-disabled guests were not required to sign the one-sided terms and conditions that disabled guests had to agree to in order to be screened for a reasonable accommodation.

66.    As such, Defendants WDPR and Does 1-5's unilateral right to change the terms without notice provided to disabled guests is deceptive and misleading. It ensures that disabled guests are perpetually under the assumption that they are bound to undefined and unpredictable conditions, fostering confusion and deterring them from asserting their rights.

67.    Defendants WDPR and Does 1-5's DAS Terms and Conditions are contrary to California's strong public policy favoring equal access to public accommodations and the protection of individuals with disabilities. Public policy

in California supports the ability of individuals to pursue collective actions,
particularly in cases involving systemic discrimination or widespread misconduct.
California's Public policy also prohibits businesses from creating additional
barriers for individuals with disabilities to access services. This deceptive
unenforceable naked class action waiver disproportionately impacts disabled
guests, who are more likely to rely on collective actions to challenge
discriminatory practices.

68.    Furthermore, the Federal Arbitration Act (FAA) does not preempt
California state laws that restrict arbitration agreements because WDPR's
unenforceable naked class action waiver does not qualify as an arbitration
agreement under the FAA. Specifically, WDPR's terms and conditions lack the
essential features of arbitration. These conditions contain no provision for
arbitration, mediation, or any alternative dispute resolution process. Unlike
arbitration agreements, which provide a forum for resolving disputes, WDPR's
deceptive unenforceable waiver simply attempts to eliminate the right to collective
actions without offering an alternative.

69.    Immediately after being required to accept Defendant WDPR's
foregoing Terms and Conditions (which, as alleged previously, deceptively omitted
material facts about the interview process), Plaintiffs Malone, Arballo, Horne, and
other consumer Class members applying for DAS were subjected to a mandatory
interview process. During this process, conducted by WDPR and/or nurse
practitioners from Defendant Inspire Health Alliance acting as WDPR's agent,
Plaintiffs Malone, Arballo, Horne and other disabled consumer class members
were required and compelled to describe their disabilities and related functional
limitations in detail in the physical presence of a licensed nurse practitioner
medical professional. This situation required Plaintiffs and other consumer
disabled consumer members to disclose their physical and mental medical

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES
CASE NO. 8:25-cv-00562-SRM-DFM

conditions, medical history, and treatments related to their disabilities, which prevented them from waiting in long lines.

70. The elicited questioning by WDPR and Inspire Health Alliance, occurred in non-confidential settings (such as public guest relations areas or non-secured video calls overhead by other cast members and guests) without adequate privacy safeguards, necessarily elicited "medical information" as defined by Cal. Civ. Code § 56.05(j). Requiring guests to disclose such detailed, individually identifiable information about their physical or mental conditions without valid patient authorization violates Cal. Civ. Code § 56.10(a) (prohibiting unauthorized disclosure by providers like Inspire acting as agents) and Cal. Civ. Code § 56.20(a) (prohibiting businesses like WDPR from requiring disclosure of medical information as a condition of receiving services unless specifically permitted by law).

71. Furthermore, conducting these compelled disclosures in non-confidential settings constituted a failure by both Defendants to implement reasonable safeguards to protect confidentiality, violating Cal. Civ. Code § 56.101.

72. The California Confidentiality of Medical Information Act (CMIA) defines "medical information" broadly as "any individually identifiable information, in electronic or physical form, in possession of or derived from a provider of health care, health care service plan, pharmaceutical company, or contractor regarding a patient's medical history, mental or physical condition, or treatment." (Cal. Civ. Code § 56.05(j)). Throughout the mandatory DAS application process—including verbal interviews conducted jointly by WDPR personnel and nurse practitioners from Defendant Inspire Health Alliance, written selections made via WDPR's online chatbot, and detailed emails sent by guests like Plaintiffs Malone, Arballo, and Horne to WDPR—Defendants WDPR and Inspire required and collected individually identifiable information regarding guests' medical histories (e.g., service-connected disabilities, genetic conditions), mental

26

or physical conditions (e.g., specific diagnoses disclosed, cognitive impairments, autoimmune disorders, severe allergies, disability status), symptoms, and functional limitations directly related to these conditions.

73.    This detailed, identifiable health information falls squarely within CMIA's definition of "medical information". The DAS application process, conducted by both WDPR cast members and nurse practitioners from Inspire Health Alliance, involved multiple stages of inquiry designed to elicit detailed personal medical information as a mechanism to evaluate and screen out those disabled guests that did not fall within WDPR's intended criteria.

74.    Initially, whether applying online or in person, guests like Plaintiffs were often asked broad, open-ended questions (e.g., "What are you calling for today?", "What would you like to tell me?"). For those applying online, WDPR's automated system first required selecting a disability category (such as neurodivergent, visually impaired, mobility issue, etc.) in writing – information WDPR then saves and stores electronically, constituting documented, individually identifiable information about a guest's general condition. WDPR also stores written identifiable information, such as a guest's name and address, electronically.

75.    Subsequently, particularly when interacting with the Inspire Health Alliance nurse practitioner, the questioning became more specific and probing, delving into sensitive areas with questions such as: "What are your concerns about waiting in a standard queue?"; "What accommodations do you use at work? At school?"; "How do you manage lines at the grocery store? The airport? The DMV?"; "What tools/techniques do you use to manage when waiting in lines?"; "If I was standing behind you in line, what might I see?"; and "What does a 'meltdown' look like for you?"

76.    Furthermore, Plaintiffs Horne, Arballo, Malone, and other disabled consumer class members submitted to questioning and evaluation by licensed nurse practitioners employed by Defendant Inspire Health Alliance, who acted as

WDPR's agent. The specific purpose was to medically assess whether their disability met WDPR's narrow criteria, such as "developmental disability like autism." In this process, Inspire acted as a "provider of health care" (Cal. Civ. Code § 56.05(m)), rendering "health care services" in the form of medical evaluation (Cal. Civ. Code § 56.05(e)). Consequently, in the context of this specific interaction involving medical assessment by licensed professionals, Plaintiffs Malone, Horne, Arballo, and other consumer class members effectively stepped into the role of "patients" under CMIA, defined as individuals who receive health care services from a provider of health care and to whom medical information pertains (Cal. Civ. Code § 56.05(k)).

77.    Therefore, the stringent confidentiality, authorization, and safeguarding requirements of CMIA applied fully to the medical information elicited and evaluated during this process by both Inspire Health Alliance and Defendant WDPR (as Inspire's principal and as a direct recipient/storer of electronic medical information).

78.    At no point during these interactions did Defendant WDPR or its agent Inspire Health Alliance provide Plaintiffs Malone, Arballo, Horne or other consumer class members with any clear written or oral disclaimer stating that they should *not* disclose specific medical diagnoses or conditions, nor did they define what might constitute protected medical information or warn that such information might be disclosed in the non-private setting. To the contrary, the nature and scope of the questions asked, particularly the structured interview and follow-up questions, were designed to, and inevitably did, elicit responses requiring the disclosure of "medical information" as defined under the California Confidentiality of Medical Information Act (CMIA), Cal. Civ. Code § 56.05(j).

79.    This definition includes any individually identifiable information regarding a patient's medical history, mental or physical condition, or treatment. Answering truthfully and completely often necessitated revealing specific

diagnoses, symptoms, severity of conditions, triggers, manifestations (e.g., what a "meltdown" looks like or what someone might "see"), and limitations – all of which fall squarely within the definition of protected "medical information."

80.    When providing medical information for DAS services to WDPR and Inspire Health Alliance, both verbally and/or in writing, Plaintiffs and other consumer Malone, Arballo, Horne and other disabled consumer class members relied on WDPR's represented terms and conditions. WDPR's terms explicitly warned disabled guests that providing false information during the process could result in serious consequences. This specifically included being permanently banned from entering Disneyland Resort and losing any purchased Magic Key passes, tickets, and other services without the possibility of a refund. WDPR's policy highlights that Plaintiffs Malone, Arballo, Horne and other consumer class members relied on the express importance WDPR placed on providing accurate truthful information when applying for DAS.

81.    Plaintiffs Malone, Arballo, Horne and other consumer class member guests with disabilities relied on WDPR's representation that it was necessary to provide WDPR with a level of detailed medical information to qualify for DAS and to be as truthful as possible, so to avoid any misunderstandings that could be perceived as dishonesty, potentially leading to severe consequences. These strict conditions are at odds with the vague and inconsistent way WDPR communicates about sharing medical information, making it discerning how transparent WDPR is with its guests about collecting and handling sensitive personal information.

82.    The DAS application interviews were frequently conducted jointly by Defendant WDPR and its agent, Inspire Health Alliance. Whether conducted in person at the resort or remotely via video call, WDPR cast members were often physically present alongside Inspire Health Alliance nurse practitioners during the interviews where sensitive medical information was solicited, including during Plaintiffs Malone, Arballo, Horne and other consumer class member guests DAS

interviews. This side-by-side participation demonstrates WDPR's direct knowledge, involvement, supervision, and control over the information-gathering process, establishing WDPR's liability as a principal or co-venturer for the actions of its agent, Inspire Health Alliance, including any violations of HIPAA committed during and following these interviews.

83.     During these joint interviews, and through WDPR's online application process, Plaintiffs Malone, Arballo, Horne and other consumer class members were subjected to questioning designed to elicit detailed personal medical information, as described previously. Notably, at no point did Defendant WDPR or Inspire Health Alliance provide clear disclaimers advising guests against disclosing specific medical conditions or explaining how elicited information would be used, stored, or protected. For guests applying online, WDPR's automated chatbot required selecting a disability category (e.g., neurodivergent, mobility) *in writing*, creating an electronic record associating the guest's identity with a specific disability type, which WDPR saves and stores. Guests would often write detailed medical information in these chatbots prior to an interview, which WDPR would then electronically save and store.

84.     Furthermore, when Plaintiffs and other consumer members expressed concerns or sought clarification after being denied DAS—often after being told by WDPR and Inspire personnel jointly that they did not have a qualifying "developmental disability like autism"—WDPR cast members directed them to email disability.services@Disneyland.com or guest.services@Disneyland.com email addresses controlled by WDPR. Following and relying on this direction, Plaintiffs and other consumer guests sent emails containing their names and detailed explanations of their medical conditions, symptoms, and inability to wait in line directly to WDPR.

85.     The information elicited during interviews, the disability category selections collected electronically via chatbot, and the detailed medical information

sent via email at WDPR's direction all constitute "medical information" as defined by CMIA, Cal. Civ. Code § 56.05(j), as it is individually identifiable information regarding guests' physical or mental conditions. WDPR, by collecting, storing, and receiving this electronic medical information (via chatbot and email) directly, and by directing and overseeing its agent Inspire Health Alliance's collection of verbal medical information, acted as an entity responsible for safeguarding this data under CMIA.

86.    Upon Plaintiffs' Malone, Arballo, Horne and other consumer class members' information and belief, the Inspire Health Alliance nurse practitioners used the elicited verbal "medical information" to perform a medically based evaluation, acting under WDPR's direction, specifically to determine if the guest fit WDPR's narrow "developmental disability like autism" criteria, thereby providing "health care services" under Cal. Civ. Code § 56.05(e). Defendants Inspire Health Alliance and WDPR failed its duty under CMIA (Cal. Civ. Code § 56.101) to implement and maintain reasonable security procedures and practices appropriate to the nature of the information, to protect the sensitive medical information it collected and stored electronically via its chatbot and the disability.services@WDPRland.com email system from unauthorized access, use, or disclosure.

87.    Further illustrating WDPR's solicitation and collection of detailed medical information outside of a secure or appropriate process, Plaintiffs Trisha Malone, Jason Arballo, and Stacy Horne, among other consumer class members, communicated sensitive medical details directly to WDPR via email after encountering denials or significant difficulties with the primary DAS application process. WDPR directly instructed plaintiffs Malone, Arballo, Horne and other consumer class members to email their concerns to WDPR but failed to inform them not to provide detailed medical information when doing so.

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES
CASE NO. 8:25-cv-00562-SRM-DFM

88.    For example, Plaintiff Trisha Malone, after being denied DAS in person despite explaining her potentially life-threatening airborne allergy to common environmental materials (found in queues and the inadequacy of suggested alternatives that risked fatal exposure, sent an email on or about July 22, 2024, to multiple WDPR executives detailing her specific allergy, its severe consequences (anaphylaxis), associated genetic conditions impacting mobility and other systems, and why DAS was medically necessary for her and her similarly allergic daughters to safely access the park.

89.    Similarly, Plaintiff Jason Arballo, following an intrusive in-person interview where documentation was refused, had his representative email WDPR's Guest Services on or about August 9, 2024, describing his service-connected disabilities impacting neurological function, memory, and stress responses, explaining why these impairments made waiting in conventional queues untenable.

90.    Likewise, Plaintiff Stacy Horne, after an extended wait and denial during an online DAS application, emailed WDPR's Disability Services on or about July 10, 2024, explaining her inability to wait in queues due to multiple autoimmune disorders (including Lupus, Sjogren's, Hashimoto's, Chronic Fatigue Syndrome) causing severe fatigue, joint pain, sun sensitivity, and lung involvement, and mentioning her status as a Social Security Disability recipient based on these conditions, offering doctor's notes as proof.

91.    These emails from Plaintiffs, sent to WDPR-provided addresses, contained their names and other identifying information alongside detailed descriptions of their specific medical conditions, symptoms, histories, functional limitations, and disability statuses provided solely to justify their need for the DAS accommodation.

92.    Moreover, WDPR advised Trisha Malone and other disabled guests who were denied DAS to email their concerns and explain how their disability prevented them from waiting in line. However, neither WDPR's cast members nor

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES
CASE NO. 8:25-cv-00562-SRM-DFM

the nurse practitioner from Inspire Health Alliance advised Ms. Malone or any other disabled consumer class members not to disclose private sensitive medical information, such as medical conditions and history, in their emails to WDPR.

93.    As a result, Ms. Malone and other disabled consumer class members who were denied DAS ended up emailing sensitive details directly to WDPR executives and departments after encountering denials or significant difficulties with the DAS application process. For instance, Plaintiff Trisha Malone, after being denied DAS in person despite explaining the life-threatening nature of her disability, sent an email on or about July 22, 2024, directly to numerous high-level WDPR executives, including WDPR's CEO Robert Iger and presidents of relevant park divisions.

94.    In this detailed email, Ms. Malone described her specific, severe, airborne anaphylactic allergy to latex, explaining how exposure to latex particles, commonly found on items like balloons potentially present in queues, could cause her throat to close and potentially lead to death before help could be rendered in a confined line. She further contextualized this by mentioning associated genetic conditions affecting multiple body systems and noting that her daughters share the same life-threatening allergy.

95.    Ms. Malone explicitly stated in the email why WDPR's suggested alternative accommodations were medically unsafe and inadequate, explaining that attempting to wait in line risked fatal exposure, and separating from her husband (her caregiver) was also unsafe and denied her equal access. At no point was Ms. Malone advised against sending this highly sensitive personal medical information via email directly to these executives, nor was she provided with any disclaimer regarding its confidential handling or secure storage by WDPR.

96.    Furthermore, Plaintiffs are informed and believe, based on public reports, that in or around July 2024, Defendant WDPR experienced a significant data breach involving internal communication systems, such as Slack channels,

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES
CASE NO. 8:25-cv-00562-SRM-DFM

which allegedly exposed vast amounts of internal data including potentially sensitive communications and data related to guest services, which Plaintiffs allege included or risked exposing the very type of identifiable disability and medical information collected from Plaintiffs and other consumer class members through the chatbot and email systems described herein.

97.    This reported data breach further evidence WDPR's failure to adequately safeguard the confidential medical information it solicited and stored electronically. WDPR and Inspire Health Alliance also failed to obtain valid authorization, as required by Cal. Civ. Code § 56.10 and § 56.20, for the collection, use, and storage of this sensitive electronic medical information. These failures constitute violations of WDPR's duties under CMIA.

98.    Furthermore, Defendant WDPR engaged in unfair, unlawful, and fraudulent business practices under California Business & Professions Code § 17200 et seq. by misrepresenting the scope and availability of its Disability Access Service ("DAS") program and misleading the public, particularly consumers with disabilities, about the accessibility of its theme park services. WDPR marketed its parks as inclusive and accessible destinations and historically provided broader access to DAS or similar accommodations for guests unable to wait in conventional queues due to various disabilities.

99.    However, on or about June 18, 2024, WDPR implemented a significantly more restrictive DAS policy, narrowing eligibility primarily to guests with certain developmental disabilities. WDPR failed to adequately and conspicuously disclose the true, limited scope and practical impact of these restrictive changes to consumers prior to their purchase of park admission or renewal of passes. This included initially using explicit restrictive language on its website (e.g., stating the program was for **"only"** certain guests) which, while later modified after Plaintiffs provided a CLRA notice, reflected the policy's narrow application. 100.    This created a misleading impression of continued broad

34

accessibility, deceiving Plaintiffs Malone and Horne into renewing expensive
Magic Key passes and Plaintiff Arballo into purchasing day passes based on prior
experiences or WDPR's general accessibility representations, only for them to be
denied the necessary DAS accommodation under the new, restrictive regime.
These acts and omissions were likely to deceive reasonable consumers with
disabilities seeking accommodation and constitute fraudulent business practices
under § 17200.

101.    Defendant WDPR's practice of directing Plaintiffs Malone, Arballo,
Horne, Gonzalez, and other consumer and employee class members denied DAS
toward purported alternative accommodations—including Attraction Queue Re-
Entry, Rider Switch, and Location Return Times—also constitutes an unfair,
unlawful, and fraudulent business practice under California Business and
Professions Code § 17200. WDPR misrepresents these alternatives as providing
meaningful or equal access when, in fact, they fail to do so and impose significant
discriminatory burdens.

102.    Specifically, both the Attraction Queue Re-Entry and Rider Switch
accommodations fundamentally fail to provide equal access because they require
the disabled guest to be physically separated from their family, friends, or
caregivers for the duration of the standby wait time while their party waits in the
conventional queue. This forces isolation upon the disabled guest, denying them
the integrated social experience of waiting together that non-disabled guests enjoy
as a standard part of the park experience, and may compromise safety for those
requiring caregiver support.

103.    Furthermore, the Location Return Time accommodation is not
equivalent to the access non-disabled guests have, as it is allegedly not available
for all attractions across Disneyland Park and Disney California Adventure Park,
potentially excluding guests from high-demand attractions available via standby to
others (such as, upon information and belief, Star Wars: Rise of the Resistance at

35

certain times) and requiring navigation to different, sometimes inconvenient, entry points. By advertising and offering these limited and burdensome procedures as viable alternatives providing equal access, WDPR deceptively misrepresents the quality and nature of the park experience available to disabled guests denied DAS.

104.  Plaintiffs Malone, Arballo, Horne and other consumer class member guests reasonably relied on WDPR's broader representations of accessibility and accommodation when incurring significant costs for park access (including Magic Key passes, day passes, parking, and related expenses), only to discover that the offered alternatives denied them the promised equal enjoyment of the parks enjoyed by non-disabled guests, causing them financial harm and significant frustration, distress, and humiliation.

105.  Through the promotion and implementation of these alternative accommodations, WDPR and Does 1-5 engaged in deceptive and unfair practices by advertising solutions that failed to meet the needs of disabled individuals, perpetuating unequal access and reinforcing systemic barriers. These practices violated California Business and Professions Code § 17200 by denying full and equitable participation for disabled guests and creating additional hardships rather than providing meaningful accommodations.

## FIRST CAUSE OF ACTION

### Breach of Confidentiality (Violation of California Common Law and CMIA (Cal. Civ. Code § 56 et seq.))

### (As Against All Defendants)

106.  Plaintiffs Malone, Arballo, and Horne incorporate all preceding paragraphs as if fully alleged herein.

107.  Plaintiffs Malone, Arballo, Horne and other similarly situated consumer member guests were in a confidential relationship with Defendants, wherein Plaintiff and other WDPR guests applying for DAS provided sensitive personal and medical information with the expectation of privacy.

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES
CASE NO. 8:25-cv-00562-SRM-DFM

108.   Defendants, as health care providers and as a third party (WDPR) privy to such information had a legal duty under California law to maintain the confidentiality of Plaintiff and other guests applying for DAS.

109.   At all times relevant herein, based on information and belief, Defendants unlawfully disclosed, shared, or misused DAS applicants' confidential information without knowledge or consent.

110.   Defendants' unauthorized disclosure directly and proximately caused harm to Plaintiff and the purported members of the classes, including emotional distress.

111.   Plaintiff and the putative classes seek actual damages, punitive damages, statutory penalties, attorney fees and injunctive relief to prevent further disclosure of confidential information.

## SECOND CAUSE OF ACTION

### Invasion of Privacy (Violation of California Constitution, Art. I, Sec. 1, and Common law Tort of Public Disclosure of Private Facts)

### (Against All Defendants)

112.   Plaintiffs incorporate all preceding paragraphs as if fully alleged herein.

113.   Plaintiffs Malone, Arballo, Horne, and other consumer class member guests possess a legally protected privacy interest under Article I, Section 1 of the California Constitution and common law in the details of their sensitive personal medical information, including their diagnoses, symptoms, medical histories, functional limitations, and disability status. Plaintiffs had a reasonable expectation that such sensitive information, when required by Defendants as part of a disability accommodation request process, would be solicited and handled in a private and confidential manner, consistent with societal norms and legal requirements like CMIA. Providing information under the duress of seeking a necessary

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES
CASE NO. 8:25-cv-00562-SRM-DFM

accommodation did not constitute a waiver of their right to privacy regarding the setting and method of disclosure or the security of the information provided.

114.    Defendants intentionally intruded upon Plaintiffs' Malone, Arballo, Horne and other consumer class members' seclusion and private affairs in a manner that would be highly offensive to a reasonable person. This intrusion included, but was not limited to: (a) compelling Plaintiffs Malone, Arballo, Horne and  other disabled consumer class members, during mandatory DAS interviews conducted by WDPR personnel and/or Inspire Health Alliance agents, to answer probing and often irrelevant personal questions designed to elicit detailed sensitive medical information (regarding conditions, symptoms, triggers, self-care abilities, behavioral manifestations like "meltdowns," etc.); and (b) conducting these interrogations in non-confidential settings (such as public guest relations areas or via non-secured virtual calls) where privacy was lacking and disclosures were inherently exposed. The highly personal nature of the required questioning itself constituted an offensive intrusion into Plaintiffs' private medical lives.

115.    Furthermore, Defendants' conduct resulted in the public disclosure of private facts, which would be offensive and objectionable to a reasonable person and were not of legitimate public concern. By conducting the compelled interviews regarding sensitive medical information in non-confidential settings, Defendants caused or allowed this private information to be disclosed to unauthorized third parties within earshot, including other guests and uninvolved WDPR employees present in these public or semi-public spaces. While the disclosure may not have been to the public at large, disclosure to *any* unauthorized third party within these settings due to Defendants' negligent or reckless choice of venue constitutes an actionable public disclosure in this context.

116.    Defendants also intruded upon Plaintiffs' privacy by collecting and storing identifiable electronic medical information via the online chatbot (disability category selections) and direct email communications (containing detailed medical

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES
CASE NO. 8:25-cv-00562-SRM-DFM

narratives) without adequate safeguards, warnings, or valid authorization, and by failing to maintain reasonable security procedures, thereby placing this highly sensitive data at foreseeable risk of exposure, as evidenced by the alleged July 2024 data breach. Defendants' conduct in designing and implementing this invasive and non-confidential process, compelling disclosures, and failing to safeguard electronic data demonstrated an intentional, reckless, and/or negligent disregard for Plaintiffs' Malone, Arballo, Horne and other consumer class members' fundamental right to privacy.

117.    As a direct and proximate result of Defendants' invasion of their privacy, Plaintiffs Malone, Arballo, Horne and  other consumer class members suffered significant harm, including, but not limited to, serious emotional distress such as profound humiliation and embarrassment from having to discuss intimate medical details in public, anxiety and fear regarding the unauthorized disclosure and insecure storage of their sensitive medical information (exacerbated by the known data breach risk), frustration, and violation of their personal dignity.

118.    Plaintiffs Malone, Arballo, Horne and the Putative Class seek compensatory damages, punitive damages (for intentional or reckless conduct), and injunctive relief to prevent future privacy violations by Defendants.

## THIRD CAUSE OF ACTION

### (Violation of California Civil Code § 1741 and General Duty of Care)

### (As Against All Defendants)

119.    Plaintiffs Malone, Arballo, Horne incorporates all preceding paragraphs as if fully alleged herein.

120.    Defendants WDPR) and its agent Inspire Health Alliance owed Plaintiffs Malone, Arballo, Horne and other consumer-class member guests, as guests and invitees to WDPR's parks and participants in its disability accommodation process, multiple duties of reasonable care under California law.

121.    These duties included, but were not limited to: (a) the duty to exercise

39

reasonable care in the operation of its public accommodations to ensure the safety and equal access of guests with disabilities; (b) the duty to exercise reasonable care in designing, implementing, and administering its disability accommodation programs and processes, including the DAS program; (c) the duty, having solicited and collected sensitive personal and medical information from disabled guests, to exercise reasonable care in the handling, storage, and safeguarding of that information; and (d) the duty to exercise reasonable care when recommending alternative accommodations to ensure they are appropriate and do not pose foreseeable harm given the guest's known or reasonably ascertainable disability-related needs.

122.   Defendant breached this duty by:

a.   Designing and implementing a mandatory DAS application process that involved compelling guests to disclose sensitive medical information in non-confidential settings, foreseeably causing privacy violations and emotional distress;

b.   Failing to implement and maintain reasonable security procedures and practices to protect the sensitive personal and medical information collected and stored electronically via online chatbots and direct email communications (including to disability.services@WDPRland.com), creating a foreseeable risk of unauthorized access and disclosure, as evidenced by, upon information and belief based on public reports, the significant data breach experienced by WDPR involving internal communications systems in or around July 2024, which potentially exposed such guest data;

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES
CASE NO. 8:25-cv-00562-SRM-DFM

c.    Failing to provide adequate warnings or disclaimers regarding the lack of security or confidentiality for medical information submitted via email or collected via chatbot;

d.    Directing Plaintiffs Malone, Arballo, Horne and  other consumer class member guests denied DAS to utilize specific alternative accommodations (e.g., Attraction Queue Re-Entry, Rider Switch, Location Return Times) when Defendants knew or reasonably should have known, based on the sensitive medical information elicited during the DAS interview process by WDPR and/or its agent Inspire, that these specific alternatives were ineffective, unduly burdensome, socially isolating, or posed foreseeable safety and health risks given the individual guest's particular disability (such as requiring proximity to triggers for Plaintiff Malone, imposing cognitive/stress loads for Plaintiff Arballo, or demanding physical exertion/sun exposure/isolation for Plaintiff Horne);

e.    Failing to adequately train and supervise WDPR personnel and Inspire Health Alliance agents involved in the DAS application process regarding privacy requirements, appropriate questioning techniques, and the safe and effective assessment of accommodation needs.

123.   Defendants further breached their duty of reasonable care through the specific methods employed during the mandatory DAS application process. Plaintiffs Malone, Arballo, Horne and other consumer class members were subjected to interviews by WDPR personnel and/or Inspire Health Alliance agents involving probing, intrusive questioning designed to elicit detailed sensitive "medical information" (Cal. Civ. Code § 56.05(j)), extending far beyond mere

41

inquiries into functional needs for queuing. Guests were asked intensely personal questions about managing bodily functions, potential behavioral manifestations ("meltdowns"), detailed accounts of how they manage daily life activities (shopping, work, home), and other information requiring the disclosure of specific symptoms, conditions, and medical histories.

124.    This interrogation occurred without Defendants providing necessary disclaimers advising guests against disclosing specific medical conditions or explaining how the highly sensitive information elicited would be used, stored, or protected. Conducting such intrusive questioning regarding sensitive medical details, particularly within the non-confidential settings previously alleged and without appropriate warnings or safeguards, constituted a negligent breach of the duty to design and administer the accommodation process with reasonable care for guest privacy and dignity, foreseeably causing emotional distress.

125.    Defendants also breached their duty of care in the handling of electronic data and the evaluation process. Defendant WDPR negligently collected identifiable disability category information via its online chatbot without adequate disclosures regarding data security and directed guests, including Plaintiffs and other class members, to transmit detailed medical narratives via inherently non-secure email addresses controlled by WDPR, failing its duty under common law and Cal. Civ. Code § 56.101 to implement reasonable security safeguards for this sensitive electronic medical information.

126.    Furthermore, WDPR breached its duty to exercise reasonable care in providing accommodations by negligently relying on Defendant Inspire Health Alliance to perform medically based evaluations (constituting "health care services" under § 56.05(e)). Upon information and belief, these evaluations focused not on the guest's functional inability to wait in a conventional queue, but narrowly on whether the guest fit WDPR's predetermined restrictive criteria (e.g., "developmental disability like autism"). Relying on such a medically specific, yet

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES
CASE NO. 8:25-cv-00562-SRM-DFM

overly narrow evaluation conducted by its agent, rather than a functional needs assessment, to deny necessary accommodations constituted a negligent failure by WDPR to ensure its accommodation process was reasonably designed to provide equal access as required by law.

127.    Defendants also breached their duties regarding the handling of sensitive information and the provision of reasonable accommodations through their use of electronic data collection and their reliance on Inspire Health Alliance's evaluation methodology. Defendant WDPR negligently collected identifiable disability category selections via its online chatbot and solicited, received, and stored detailed medical narratives submitted by Plaintiffs Malone, Arballo, Horne and  other consumer class members via inherently non-secure email addresses, all without providing adequate notice regarding data security practices or implementing reasonable safeguards, thereby breaching its duty of care concerning sensitive electronic data, as further evidenced by the alleged July 2024 data breach.

128.    Additionally, WDPR breached its duty to exercise reasonable care in the accommodation process itself by relying upon Inspire Health Alliance (acting as a "provider of health care" rendering "health care services" under CMIA § 56.05(e) & (m)) to perform narrow, medically based evaluations focused primarily on determining if a guest fit the specific "developmental disability like autism" criteria. Utilizing this quasi-diagnostic approach conducted by its agent, rather than focusing on a functional assessment of the guest's ability to wait in a conventional queue regardless of disability type, constituted a negligent method for determining eligibility for necessary accommodations, foreseeably leading to wrongful denials and harm.

129.    As a direct and proximate result of Defendants' negligence, Plaintiffs Malone, Arballo, Horne, and the consumer class members suffered injuries and damages. These include the denial of equal access to and enjoyment of WDPR's parks, financial losses related to park admission and associated costs for an

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES
CASE NO. 8:25-cv-00562-SRM-DFM

unequal experience (and potentially the forced purchase of paid services like Lightning Lane), exposure to foreseeable health and safety risks due to inadequate accommodations, and significant emotional distress. The distress suffered, including humiliation from public questioning about disabilities, anxiety over the security of sensitive medical data (particularly in light of the reported data breach), frustration from arbitrary denials and ineffective alternatives, and feelings of isolation and discrimination, constitutes serious emotional distress under California law.

130.    Plaintiffs and the putative class seek compensatory damages for economic losses and emotional distress, punitive damages (to the extent conduct is proven willful or reckless), and costs of litigation resulting from Defendants' negligence.

## FOURTH CAUSE OF ACTION

**Violation of the Unruh Civil Rights Act (Cal. Civ. Code § 51 et seq.)**

**(Against Defendant Walt WDPR Parks and Resorts U.S. Inc. and Does 1-50 Only)**

131.    Plaintiff incorporates all preceding paragraphs as if fully alleged herein.

132.    Defendant WDPR owns and operates Disneyland Resort (including Disneyland Park and WDPR California Adventure Park) in Anaheim, California, which is a place of public accommodation under California Civil Code § 51(b) and the Americans with Disabilities Act (ADA), 42 U.S.C. § 12181(7).

133.    As a place of public accommodation, WDPR is obligated under the Unruh Civil Rights Act to provide full and equal access to its goods, services, facilities, privileges, advantages, and accommodations to all persons in California regardless of their disability (Cal. Civ. Code § 51(b)). The Unruh Act incorporates ADA's standards, including its prohibitions against discrimination.

134.   On or about June 18, 2024, Defendant WDPR implemented modifications to its Disability Access Service ("DAS") policy, including changes to eligibility criteria and the application process. Under the revised policy, WDPR restricted DAS eligibility to guests who, due to specific developmental disabilities like autism, are unable to wait in a conventional queue for an extended period. WDPR expressly stated this intent in its terms and conditions: "The Disability Access Service (DAS) is intended to accommodate only Guests who, due to a developmental disability like autism or similar, are unable to wait in a conventional queue for an extended period of time."

135.   WDPR utilizes standards, criteria, and methods of administration that have the effect of discriminating on the basis of disability, in violation of 42 U.S.C. § 12182(b)(1)(D)(i), and perpetuate the discrimination of others subject to common administrative control, violating 42 U.S.C. § 12182(b)(1)(D)(ii). The specific eligibility criteria WDPR adopted for DAS, focusing narrowly on certain developmental disabilities, like autism while excluding others with similar functional limitations regarding queueing, inherently discriminates based on disability type. WDPR utilized Inspire Health Alliance's services, in part, to apply these restrictive criteria. The alleged methods of administration, including requiring discussion of sensitive medical information in non-private settings (as alleged elsewhere herein), also have the effect of discriminating against those needing accommodation.

136.   By implementing these restrictive eligibility criteria, WDPR subjects Plaintiffs Malone, Arballo, Horne and  other consumer class member guests, on the basis of their disabilities, "to a denial of the opportunity... to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations" of WDPR's theme parks, namely the DAS accommodation itself and the equal access to attractions it facilitates, in violation of 42 U.S.C. § 12182(b)(1)(A)(i). Despite Plaintiffs' Malone, Arballo, Horne and other consumer

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES
CASE NO. 8:25-cv-00562-SRM-DFM

member guests' willingness and ability to provide appropriate medical documentation through a confidential, HIPAA-compliant process to substantiate their disability and need for queue accommodation, WDPR denied them DAS based on its overly narrow criteria.

137.   WDPR's restrictive DAS policy also affords Plaintiffs Malone, Arballo, Horne and other consumer class members an opportunity "to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is not equal to that afforded to other individuals," in violation of 42 U.S.C. § 12182(b)(1)(A)(ii). By denying DAS to those whose disabilities prevent queueing but do not meet the narrow criteria, WDPR relegates them to alternative accommodations (such as Attraction Queue Re-Entry, Rider Switch, or Location Return Times). As alleged elsewhere herein, these alternatives are not functionally equivalent to DAS, impose significant additional burdens, create safety risks, and fail to provide an equal opportunity to experience the parks compared to non-disabled guests or disabled guests who receive DAS.

138.   WDPR's alternative accommodations, such as Rider Switch and Attraction Queue Re-Entry, inherently fail to offer disabled guests the same level of enjoyment and access to park experiences as their non-disabled counterparts. Unlike non-disabled guests, who can remain together with family and friends, disabled guests using these alternatives are often required to be isolated from their companions. This separation not only deprives them of the shared experience and enjoyment but also imposes an additional layer of emotional and social burden, creating a disparity in the overall park experience. The inability to enjoy attractions in the company of loved ones fundamentally undermines the essence of equal access and enjoyment that should be uniformly available to all guests, regardless of disability.

139.   As a result, the alternative accommodations WDPR offers constitute a discriminatory "separate benefit" in violation of 42 U.S.C. § 12182(b)(1)(A)(iii).

WDPR provides the DAS accommodation only to a select specific group based on a specific criteria. For Plaintiffs Malone, Arballo, Horne and other consumer class members excluded from DAS but requiring a queue alternative, the separate accommodations offered by WDPR are not "as effective as" DAS in providing equal access. This practice constitutes the unlawful provision of a separate and unequal benefit based on disability type.

140.   Disabled guests, including Plaintiffs Malone, Arballo, Horne and other disabled consumer class member guests, faced significant challenges and unequal access to the parks without DAS. They had to either spend additional money on Lightning Lane access to enjoy the parks attractions equally to non-disabled guests, separate from their family members or companions waiting in regular lines, or not be provided return times for all attractions, like Star Wars: Rise of the Resistance and all Disney California Adventure's attractions. Additionally, the absence of an accommodation like DAS prevented Plaintiffs Horne, Malone, and other disabled class members from visiting the parks at all, thereby depriving them of the benefits of their previously purchased passes.

141.   WDPR's restrictive eligibility criteria also constitute an unlawful screening mechanism under the ADA, 42 U.S.C. § 12182(b)(2)(A)(i), as incorporated by the Unruh Act. These criteria "screen out or tend to screen out" individuals with disabilities (namely, those whose disabilities prevent conventional queueing but are not the specific developmental disabilities favored by WDPR's policy) from fully and equally enjoying the goods, services, facilities, privileges, advantages, or accommodations of the Disneyland Resort. WDPR cannot show that limiting DAS *only* to individuals with specific developmental disabilities like autism is necessary for the provision of its services, facilities, or accommodations.

142.   Further, upon information and belief, the reason provided to Plaintiff Arballo for his and other disabled military veterans DAS denial – that they allegedly did not qualify because they were not born with a disability. Disabled

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES
CASE NO. 8:25-cv-00562-SRM-DFM

military veterans, such as plaintiff Arballo, who openly disclosed their veteran status, explained how their disability hindered them from enduring lengthy queues and denied DAS, illustrates WDPR's discriminatory intent towards those with disabilities and military veterans. WDPR's practice penalizes individuals with acquired disabilities that are prevalent among veterans who have sustained injuries during their service. By implementing and enforcing criteria that effectively screen out veterans with service-connected disabilities who require queue accommodation, Defendant WDPR discriminates based on disability type closely associated with veteran status, thereby violating the Unruh Act's prohibition against discrimination based on both disability and veteran or military status.

143.    Alternatively, and additionally, WDPR's refusal to grant DAS access to Plaintiffs and Class members constitutes a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, in violation of 42 U.S.C. § 12182(b)(2)(A)(ii). Providing DAS, or a functionally equivalent virtual queue system, is a necessary and reasonable modification for Plaintiffs Malone, Arballo, Horne and other consumer class members to access WDPR's attractions equally, and WDPR's refusal to provide this modification based on its narrow criteria is discriminatory.

144.    WDPR's policies and practices demonstrate a willful and intentional disregard for the rights of individuals with a broad range of disabilities who cannot wait in conventional queues. By imposing eligibility criteria that effectively screen out such individuals or by failing to provide necessary reasonable modifications, WDPR knowingly perpetuates discriminatory practices that deny these guests the full and equal access guaranteed by the Unruh Civil Rights Act and the ADA.

145.    Plaintiffs Malone, Arballo, Horne and other consumer class members seek injunctive relief requiring Defendant WDPR to modify its DAS policies and

48

practices to comply fully with the Unruh Act and the ADA, including eliminating

eligibility criteria that unlawfully screen out individuals based on disability type

and ensuring that DAS or a functionally equivalent queue accommodation is

available to all individuals whose disabilities prevent them from safely waiting in

conventional queues, subject only to lawful methods of verification.

146.    Defendant WDPR's refusal to grant DAS access to Plaintiffs Malone,

Arballo, Horne and other consumer member guests whose disabilities preclude

waiting in conventional queues but do not meet WDPR's narrow criteria constitutes

a failure to make reasonable modifications in policies, practices, or procedures,

when such modifications are necessary to afford such goods, services, facilities,

privileges, advantages, or accommodations to individuals with disabilities, in direct

violation of 42 U.S.C. § 12182(b)(2)(A)(ii), as incorporated by the Unruh Civil

Rights Act. Providing DAS, or a functionally equivalent virtual queue

accommodation, is a necessary modification for Plaintiffs Malone, Arballo, Horne

and other consumer class member guests to achieve equal access to WDPR's

attractions, given their inability to wait in standard queues. WDPR's current policy,

which effectively eliminates this necessary modification for a large class of

disabled individuals based on overly restrictive criteria, is discriminatory.

147.    WDPR cannot demonstrate that making such modifications (i.e.,

providing DAS or an equivalent to all disabled guests who cannot wait in

conventional queues) "would fundamentally alter the nature of such goods,

services, facilities, privileges, advantages, or accommodations." Indeed, WDPR

previously provided DAS more broadly, demonstrating the feasibility of such

accommodation without fundamental alteration, and numerous alternative

modifications exist, as detailed below.

148.    Such reasonable modifications are feasible and would not

fundamentally alter the nature of WDPR's services, as providing access

accommodations and managing queues are already integral parts of WDPR's theme

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES
CASE NO. 8:25-cv-00562-SRM-DFM

park operations. For instance, WDPR could implement a modified DAS system that could serve all guests whose disabilities prevent waiting in conventional queues, irrespective of the specific disability type, while addressing WDPR's stated concerns regarding potential system abuse. One such modification could involve allocating DAS via a virtual queue, perhaps capped at a reasonable number based on park capacity or other operational factors.

149.  Within this system, guests could initially attest to having a disability requiring the accommodation. Crucially, to mitigate concerns about potential misuse without resorting to discriminatory criteria or invasive public questioning, WDPR could offer guests the voluntary option to undergo a private, HIPAA-compliant verification process with a qualified, independent third-party reviewer chosen by WDPR (e.g., IBCCES, Inspire Health Alliance, or similar). Guests choosing this optional verification could then receive priority access within the virtual queue for DAS slots over those relying solely on attestation.

150.  This approach directly addresses potential abuse concerns by allowing WDPR greater assurance for prioritized guests, yet it does not fundamentally alter the service because it still provides the DAS accommodation itself. This modification would make DAS available equitably to all guests who cannot wait in standard queues, unlike the current system which unlawfully restricts access based on limiting it primarily to autism or similar developmental disabilities). It ensures guest privacy, avoids public medical disclosures, is not unduly burdensome (as verification is optional), and represents one possible reasonable modification that eliminates the discriminatory effect of WDPR's current policy while still allowing for manageable administration. Other reasonable modifications that achieve compliance may also exist.

151.  As a direct and proximate result of Defendant WDPR's and Does 1-50's discriminatory actions, Plaintiffs Malone, Arballo, Horne and  other consumer class members they represent were denied equal access to the DAS

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES
CASE NO. 8:25-cv-00562-SRM-DFM

accommodation and, consequently, were unable to fully and equally participate in and enjoy Defendant's services, facilities, privileges, and advantages, causing them harm, including denial of access, frustration, humiliation, and emotional distress.

152.   Pursuant to California Civil Code § 52, Plaintiffs Malone, Arballo, Horne and other consumer class members are entitled to statutory damages of no less than $4,000 per violation, actual damages, treble damages, attorneys' fees, costs, and injunctive relief.

153.   Plaintiffs and the class seek injunctive relief requiring WDPR to modify its DAS policies to comply with the Unruh Act and ensure that accommodations are available to all individuals with disabilities, not just those with developmental disabilities. Additionally, Plaintiff and the class seek statutory damages, attorneys' fees, and costs of suit.

## FIFTH CAUSE OF ACTION

## Violation of the California Confidentiality of Medical Information Act (Cal. Civ. Code § 56 et seq.)

## (Against All Defendants)

154.   Plaintiffs Malone, Arballo, and Horne incorporate all preceding paragraphs as if fully alleged herein.

155.   The California Confidentiality of Medical Information Act (CMIA) establishes specific protection for sensitive patient health information. "Medical information" under CMIA includes "any individually identifiable information, in electronic or physical form, in possession of or derived from a provider of health care... regarding a patient's medical history, mental or physical condition, or treatment." (Cal. Civ. Code § 56.05(j)). As alleged herein, the information

156.   Defendants WDPR and Inspire Health Alliance solicited, collected, used, and stored included detailed, individually identifiable information about Plaintiffs' Malone, Arballo, Horne and other consumer members' medical histories, physical and mental conditions (including diagnoses, symptoms, triggers, severity),

and functional limitations directly tied to those conditions, gathered through verbal interviews, online chatbot selections, and direct email communications. This information constitutes protected "medical information" under § 56.05(j).

157.    Defendant Inspire Health Alliance, through its licensed nurse practitioners employed to evaluate guests for WDPR's DAS program, acted as a "provider of health care" (§ 56.05(m)). By conducting medically based evaluations using elicited medical information to determine if guests met specific, narrow disability criteria set by WDPR (e.g., "developmental disability like autism or similar"), Inspire rendered "health care services" (§ 56.05(e)). In the context of these mandatory medical evaluations, Plaintiffs Malone, Arballo, Horne and other consumer class member guests interacting with Inspire's licensed professionals became "patients" under CMIA (§ 56.05(k)), triggering the Act's protections.

158.    Defendant Inspire acted as the agent of Defendant WDPR. This agency relationship is established by facts alleged herein, including Inspire's performance of evaluations solely for WDPR's program according to WDPR's narrow criteria, the joint participation of WDPR and Inspire personnel in interviews, WDPR's control over the overall process, and WDPR's direction of guests to Inspire. WDPR, as the principal directing its agent Inspire in the solicitation and evaluation of medical information, is liable for Inspire's CMIA violations. WDPR cannot evade CMIA duties by contracting out the medical evaluation component of its accommodation process, especially when it retains control and benefits from the information gathered.

159.    WDPR is also independently subject to CMIA. WDPR directly solicited, received, maintained, and stored identifiable electronic "medical information" via its chatbot and email systems. As an entity possessing such electronic medical information, WDPR owed a direct duty under § 56.101 to implement and maintain reasonable security safeguards. Furthermore, as the entity orchestrating the entire DAS process which required disclosure of medical

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES
CASE NO. 8:25-cv-00562-SRM-DFM

information, WDPR had obligations under § 56.20(a) not to require such disclosure as a condition of service unless legally permitted, and under § 56.10 not to disclose or misuse information obtained directly or through its agent without valid authorization.

160.    Defendants WDPR and Inspire violated CMIA through multiple acts and omissions. First, they compelled the disclosure of detailed "medical information" from Plaintiffs Malone, Arballo, Horne and other class members during verbal interviews conducted in non-confidential settings (public areas, non-secure video calls) without valid patient authorization and without adequate privacy safeguards. This constitutes an unauthorized disclosure/release by Inspire (as provider/agent) and WDPR (as principal) in violation of § 56.10(a) and an unlawful requirement by WDPR (as a business conditioning service on unauthorized medical information disclosure) under § 56.20(a). Contrary to Defendants' potential arguments, these disclosures were not voluntary waivers but were compelled responses to probing questions required to obtain necessary accommodation, occurring after acceptance of allegedly deceptive terms.

161.    Second, Defendants, WDPR and Inspire, failed their duty under § 56.101 to implement and maintain reasonable security safeguards for the "medical information" collected. This failure is demonstrated by: (a) conducting sensitive medical discussions in non-confidential settings susceptible to overhearing by unauthorized third parties; and (b) failing to provide adequate security for, or warnings regarding the lack of security for, the identifiable electronic "medical information" collected via chatbot and solicited/received via inherently non-secure email channels, placing this sensitive data at foreseeable risk, as evidenced by the alleged significant data breach involving WDPR's internal communications systems reported around July 2024.

162.    Based upon information and belief, the DAS screening process constituted 'health care services' because it involved professional medical

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES
CASE NO. 8:25-cv-00562-SRM-DFM

assessment and diagnosis of guests' conditions to determine appropriate accommodations, similar to occupational therapy evaluations or disability assessments, which are explicitly included as health care services under Civil Code § 56.05(e).

163.    Third, Defendants failed to obtain valid, specific written authorization compliant with § 56.11 from Plaintiffs Malone, Arballo, Horne and other consumer class members before collecting, using, and potentially sharing their "medical information" between Inspire and WDPR for the purpose of the narrow eligibility evaluation. The general acceptance of DAS Terms and Conditions, particularly given their deceptive omissions regarding Inspire's role and the medical nature of the evaluation, does not constitute valid authorization under CMIA.

164.    Under Civil Code § 56.101(a), entities maintaining medical information must preserve the confidentiality of that information using appropriate safeguards. Defendants systematically failed to implement such safeguards by conducting medical assessments in public areas, allowing non-medical WDPR staff to participate in medical discussions, and failing to provide private spaces for medical screenings. This complete absence of privacy protocols violated their statutory duty to protect confidential medical information.

165.    Defendants Inspire Health Alliance and each of their nurse practitioners acted at WDPR's direction to determine guests' eligibility for WDPR's Disability Access Service. WDPR exercised control over Inspire Health Alliance provider's activities as an agent of (or co-venturer with) Inspire Health Alliance (a licensed health care provider). Further, WDPR either knew or should have known about Inspire Health Alliance's failure to maintain confidentiality, making them equally liable as a collaborator or principal.

166.    Civil Code § 56.26(a) requires third parties who receive medical information to maintain the same standards of confidentiality as healthcare providers. Based upon information and belief, WDPR, as a recipient of medical

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES
CASE NO. 8:25-cv-00562-SRM-DFM

information through its partnership with Inspire Health Alliance, failed to maintain these standards by integrating medical screenings into public guest service operations and allowing cast members to observe and participate in medical discussions. This integration of medical assessments into public guest services operations fundamentally undermined medical privacy protections. Additionally, or alternatively, Defendant WDPR subjected itself to CMIA obligations by functioning as a "Contractor," specifically a "medical service organization" (MSO), in its administration of the DAS program. CMIA defines a "Contractor," in relevant part, as "a person or entity that is a... medical service organization..." (Cal. Civ. Code § 56.06(a)).

167.    While typically providing administrative and management services to healthcare providers, Plaintiffs allege WDPR functionally acted as an MSO in this context. WDPR designed and implemented the system wherein medical information was solicited and collected; it contracted with and directed Inspire Health Alliance (a healthcare provider agent) to perform medical evaluations based on that information for WDPR's specific program criteria; it directly received, processed, managed, and electronically stored identifiable medical information submitted by

168.    Plaintiffs Malone, Arballo, Horne and other consumer class members via its online chatbot and designated email addresses (including emails sent directly to WDPR executives, like WDPR's CEO Robert Iger, at WDPR's implicit or explicit direction); and it utilized this stored medical information and Inspire Health Alliance evaluations, solely for the administrative purpose of determining eligibility for, and managing access to, its DAS service. By actively managing, storing, processing, and utilizing sensitive medical information derived directly from guests and via its healthcare provider agent to administer a component of its business operations (the DAS eligibility process), WDPR performed functions analogous to those of an MSO handling administrative services related to health

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES
CASE NO. 8:25-cv-00562-SRM-DFM

information. Therefore, WDPR assumed the duties and obligations applicable to contractors, including MSOs, under CMIA, including the duties of confidentiality and safeguarding medical information. WDPR's argument that it cannot be a contractor under § 56.06(a) ignores its functional role in actively managing and utilizing solicited medical information for the administration of its program.

169.    Based on information and belief, Defendants, along with each of them, required Plaintiffs and other disabled members to publicly disclose specific details about their diagnosis, symptoms, mobility limitations, and sensory triggers within earshot of others, either in lines or near other cast members and guests, to qualify for the DAS service. During these DAS interviews, Defendants and each of them failed to provide a private room, a confidentiality notice, or any attempt to mitigate other guests and cast members overhearing disclosure of private medical information.

170.    In fact, the entire point of this disclosure was to confirm or assess whether guests meet WDPR's medical/disability-based criteria for DAS. The public disclosures went beyond, simply inquiring whether guests had trouble standing or difficulty waiting in long lines. Instead, the public DAS interview required guests to disclose actual medical conditions, with enough specificity to meet the definition of "medical information" under CMIA.

171.    Further, at all relevant times and based on information and belief, nurse practitioners employed by or affiliated with defendants Inspire Health Alliance and each of them, were positioned side-by-side with WDPR cast members during DAS screenings, whether those screenings occurred in-person at the Disneyland Resort or virtually via video call. As such, both the WDPR cast member and Inspire Health Alliance's nurse practitioner actively participated in the same conversation with guests, thereby reinforcing that Inspire Health Alliance was acting on WDPR's behalf, and under WDPR's direct supervision, in collecting medical information.

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES
CASE NO. 8:25-cv-00562-SRM-DFM

172.    By arranging for a nurse practitioner to stand physically alongside WDPR personnel, Defendants WDPR and Does 1-5 effectively merged the roles of WDPR's cast members and Inspire Health Alliance's healthcare providers, rendering them jointly responsible for any violations of the California Confidentiality of Medical Information Act (CMIA). This setup created the appearance and practical reality that the nurse practitioner's actions were taken at WDPR's direction, reinforcing Defendants' agency, co-venture, or contractor relationship.

173.    Based on information and belief, Defendants WDPR, Does 1-5's, Inspire Health, and Does 6-10, unlawfully compelled guests to disclose confidential medical information without adequate safeguards, violating the CMIA. Defendants and each of them did not merely passively receive minimal information, but actively collected, reviewed, and stored detailed medical disclosures (e.g., nature of disability, severity, whether guests could stand in line, etc.).

174.    Defendants' and each of their practices constituted negligent release of medical information under Civil Code § 56.36(b) through their systematic failure to protect confidentiality during screenings. The routine disclosure of medical information in public settings and sharing of medical details between entities without proper safeguards created an ongoing pattern of privacy violations that harmed guests seeking accommodations.

175.    The CMIA prohibits any business from requiring individuals to disclose medical information unless specifically permitted by law. (Cal. Civ. Code § 56.20). Defendants and each of them unlawfully required guests to disclose sensitive medical information to its employees and third-party contractors in non-confidential settings as a prerequisite for DAS accommodations. There is no legal authority permitting Defendants and each of them to collect this information, let

alone requiring guests to share it in public spaces where it can be overheard by other employees and park visitors.

176.    Defendants and each of them also violated CMIA by failing to obtain valid, specific written authorization compliant with § 56.11, before collecting, using, and sharing medical information between Inspire and WDPR for the narrow eligibility evaluation. General acceptance of DAS Terms and Conditions, particularly given the deceptive omissions alleged, does not constitute valid CMIA authorization. The CMIA provides statutory damages of $1,000 per violation if "the disclosure was… negligent", in addition to any actual damages resulting from emotional distress or harm caused by the unauthorized disclosure of medical information. **(**Cal. Civ. Code § 56.36(b)**).**

177.    Defendants, and each of them, unlawfully harmed Plaintiff Trisha Malone and similarly situated guests who applied for DAS by collecting and disclosing sensitive medical information without authorization and in blatant disregard of privacy protections. This unauthorized and public handling of confidential medical details subjected Plaintiffs to humiliation, emotional distress, and a profound loss of dignity. These injuries were the direct and foreseeable result of Defendants' deliberate and reckless failure to implement appropriate safeguards for the collection, use, and disclosure of private health information.

## SIXTH CAUSE OF ACTION

## Violation of California Business and Professions Code § 17200 et seq.
## (Against Defendant WDPR and Does 1-50 only)

178.    Plaintiffs Trisha Malone, Jason Arballo, Stacy Horne, Monica Gonzalez, incorporate by reference all preceding paragraphs as though fully set forth herein.

179.    Defendants' acts and practices related to the modification, implementation, and administration of its Disability Access Service ("DAS") program on or after June 18, 2024, constitute unlawful, unfair, and fraudulent

58

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES
CASE NO. 8:25-cv-00562-SRM-DFM

business practices prohibited by California Business and Professions Code § 17200 et seq. ("UCL").

180.  Defendants' conduct is unlawful under the UCL because it violates multiple California statutes designed to protect consumers, employees, and individuals with disabilities, as alleged in detail in the other Causes of Action herein. These predicate violations include, but are not limited to:

a. Violating the Unruh Civil Rights Act (Cal. Civ. Code § 51 et seq.) by implementing discriminatory eligibility criteria for DAS that unlawfully screen out individuals based on disability rather than functional need, failing to provide necessary reasonable modifications, and denying full and equal access to park accommodations, privileges, and advantages (as alleged in the Fourth Cause of Action).

b. Violating the California Confidentiality of Medical Information Act (CMIA) (Cal. Civ. Code § 56 et seq.) by compelling unauthorized disclosures of sensitive medical information in non-confidential settings, failing to obtain valid authorization, and failing to implement reasonable safeguards for verbal and electronic medical information collected directly and through its agent, Inspire Health Alliance (as alleged in the Fifth Cause of Action).

c. Violating the Consumer Legal Remedies Act (CLRA) (Cal. Civ. Code § 1750 et seq.) through deceptive practices, including misrepresenting the scope and accessibility of the DAS program and park services, failing to disclose material facts about the application process in its Terms and Conditions, and imposing unconscionable terms, such as the void naked

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES
CASE NO. 8:25-cv-00562-SRM-DFM

class action waiver (as alleged in the Seventh Cause of Action).

d. Violating the Fair Employment and Housing Act (FEHA) (Cal. Gov. Code § 12940(a)) by engaging in intentional and/or disparate impact disability discrimination against Plaintiff Gonzalez and the FEHA Employee Subclass concerning the terms, conditions, or privileges of employment, specifically regarding access to the DAS accommodation necessary to utilize their park pass benefit (as alleged in the Seventh and Eighth Causes of Action).

e. Violating California Labor Code § 432.6 by requiring Plaintiff Gonzalez and the Disney disabled employee subclass, as a condition of receiving an employment-related benefit, to waive rights and procedures under FEHA through mandatory acceptance of the DAS Terms and Conditions (as alleged in the Ninth Cause of Action).

f. Violating FEHA via California Government Code § 12953 by committing an unlawful employment practice through the violation of Labor Code § 432.6.

181.    WDPR's conduct constitutes an unfair business practice under California's Unfair Competition Law (UCL). It violates fundamental public policies that protect the rights of individuals with disabilities, safeguard medical privacy, promote fair employment practices, and preserve access to justice.

182.    Defendants' practices disproportionately burden disabled consumers and employees by imposing intrusive, confusing, and discriminatory requirements on those seeking access to basic recreational services or employment-related benefits. These vulnerable populations are forced to navigate exclusionary barriers

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES
CASE NO. 8:25-cv-00562-SRM-DFM

under the guise of a disability accommodation process that is anything but accessible.

183.   The mandatory Terms and Conditions—presented as a non-negotiable prerequisite to applying for DAS—include a coercive class action waiver and a unilateral modification clause. The waiver violates both the Consumer Legal Remedies Act (CLRA) and California Labor Code § 432.6. These provisions reflect a deliberate abuse of Defendants' dominant market position and create an unjust and unlawful imbalance of power between WDPR and disabled applicants.

184.   Defendants further compound this imbalance by directing disabled guests and employees, once denied DAS, toward alternative accommodations that are foreseeably ineffective, unsafe, or unduly burdensome given their disabilities. This conduct is inherently unfair and fails to provide meaningful access as required under disability rights statutes.

185.   Additionally, Defendants' alleged prioritization of revenue—through paid services such as Lightning Lane—over the provision of legally mandated, cost-free accommodations like DAS, constitutes an unlawful and unethical profit motive. By artificially restricting DAS eligibility and pushing disabled guests toward paid options, WDPR elevates financial interests above the civil rights of its most vulnerable patrons.

186.   Finally, Defendants' failure to implement and maintain adequate safeguards for sensitive medical information provided during the DAS application process—despite collecting that data through structured questioning and email communications—demonstrates a reckless disregard for privacy obligations and further supports a finding of unfair business practices under the UCL.

187.   Defendants' conduct constitutes fraudulent business practices under California's Unfair Competition Law (UCL) because it was likely to deceive reasonable consumers and employees, particularly individuals with disabilities who relied on Defendants' public representations of accessibility and fair treatment.

188.   Defendants misled disabled guests and employees by creating the false impression that Disneyland and California Adventure maintained broad accessibility and continued availability of DAS accommodations, even after implementing significant and undisclosed restrictive policy changes.

189.   These deceptive omissions and representations induced Plaintiffs Malone, Arballo, and Horne—and other similarly situated consumer class members—to purchase or renew expensive Magic Key passes and day tickets under the mistaken belief that they would receive DAS as they had previously. Likewise, employees like Plaintiff Gonzalez accepted or continued employment relying on the perceived value of DAS access as a means to fully utilize their employee park admission benefits.

190.   Defendants intentionally omitted material facts from the DAS Terms and Conditions, including the requirement that disabled applicants would be subjected to a mandatory evaluation by a third-party medical contractor, Inspire Health Alliance, and the probing, diagnostic nature of the evaluation process itself.

191.   Defendants also misrepresented the availability and adequacy of so-called "alternative accommodations" such as Rider Switch, Queue Re-Entry, or Location Return Times. These alternatives are not equivalent in access and often present undue physical or psychological burdens, increased safety risks, and social isolation—especially for guests who require the support of companions or caregivers.

192.   Defendants' conduct was fraudulent because it concealed critical information that reasonable consumers and employees would have considered material in deciding whether to purchase admission, renew passes, or accept/continue employment.

193.   This conduct was also unfair under the UCL because it violated public policy protecting disabled individuals, undermined trust in accessibility representations, and was pursued for the unjustified purpose of increasing revenue

and reducing the cost of compliance with disability laws, at the expense of vulnerable guests and employees.

194.   Defendants' conduct described above was unfair and fraudulent within the meaning of the UCL because it was against established public policy and has been pursued to attain an unjustified advantage, potentially including monetary advantage.

195.   Plaintiffs and the class seek an order of this Court awarding restitution and injunctive relief and all other relief allowed under the UCL, including interest and attorneys' fees pursuant to, inter alia, Code of Civil Procedure section 1021.5, and to such other further relief as this Court may deem just and proper.

## SEVENTH CAUSE OF ACTION
## Violation of the Consumer Legal Remedies Act (CLRA)
## (Cal. Civ. Code § 1750 et seq.)
## (Against Defendant Walt WDPR Parks and Resorts U.S., Inc. and Does 1-50)

196.  Plaintiffs Malone, Arballo, and Horne hereby incorporate by reference all preceding paragraphs of this Complaint as though fully set forth herein.

197.  The CLRA has two important provisions that are relevant to this discussion: 1) "[a]ny waiver by a consumer of the provisions of this title is contrary to public policy and shall be unenforceable and void" (CAL CIV. CODE § 1751) and 2) "[a]ny consumer entitled to bring an action under [the CLRA] may…bring an action on behalf of himself and such other consumers." CAL CIV. CODE § 1781 (emphasis added). Each of these binding laws definitively declares that a consumer cannot waive the ability to bring a class action under the CLRA. See, e.g., *Sanchez v. Valencia Holding Co., LLC,* 61 Cal.4th 899, 923 (2015) ("[C]lass actions are among the provisions of the CLRA that may not be waived"); Discover Bank, 36 Cal.4th at 160 ("we note that plaintiff does not plead a CLRA cause of action and so does not invoke its anti-waiver provision"); *Fisher v. DCH Temecula Imports, LLC*, 187 Cal.App.4th 601, 619 (2010) ("[T]he CLRA does not

allow a consumer to waive the provisions of the CLRA in advance, including the right to bring a class action."). Clearly, any purported class action waiver that seeks to strike rights to commence a CLRA class is against public policy, unenforceable, and void.

198.  Plaintiffs Trisha Malone, Jason Arballo, Stacy Horne, and the consumer class members seek to represent are "consumers" as defined by the Consumer Legal Remedies Act ("CLRA"), because they are individuals who sought or acquired, by purchase (e.g., theme park tickets, Magic Key passes), services for personal, family, or household purposes, namely access to and enjoyment of Defendant WDPR's theme park facilities and attractions.

199.  Defendant WDPR provides "services" subject to the CLRA, Cal. Civ. Code § 1761(b), including, but not limited to, providing access to its theme parks and the attractions therein. A critical component of these services for Plaintiffs and Class members is the provision of reasonable accommodations necessary for them to equally access and enjoy the park experience due to their disabilities. The Disability Access Service ("DAS") represents such accommodation, privilege, and component of the overall service offered and marketed to consumers, including those with disabilities.

200.  Defendant WDPR, directly and through Does 1-50, engaged in unfair methods of competition and unfair or deceptive acts or practices undertaken in transactions intended to result or which resulted in the sale of services to consumers, in violation of the CLRA, including, but not limited to, the following:

a.    Misrepresenting the characteristics, uses, and benefits of its services, in violation of Cal. Civ. Code § 1770(a)(5): WDPR represented its theme parks as accessible destinations for all guests with disabilities, including through the prior availability and marketing of the DAS program. However, WDPR subsequently implemented highly restrictive eligibility criteria for DAS, focusing

primarily on specific developmental disabilities, without adequate
notice to consumers who had purchased or were contemplating
purchasing park access (via tickets or Magic Key passes) in reliance
on the availability of necessary accommodations like the broader
DAS. This change misrepresented the actual accessibility
characteristics and benefits of the service being offered and
purchased, particularly for guests with disabilities not fitting the
narrow new criteria. WDPR failed to clearly and conspicuously
disclose the significant limitations placed on DAS eligibility prior to
or at the point of sale for park admission.

b.      Advertising services with intent not to supply reasonably
expectable demand, in violation of Cal. Civ. Code § 1770(a)(9):
WDPR advertised its parks as broadly accessible while allegedly
intending to, or having the effect of, severely restricting the supply of
the necessary DAS accommodation below the reasonably expectable
demand from the significant number of guests with various
disabilities who cannot wait in conventional queues. This restriction
was implemented through the adoption of the narrow eligibility
criteria, rendering the advertised accessibility illusory for many
disabled consumers.

c.      Representing that the transaction confers or involves rights or
remedies which are prohibited by law, in violation of Cal. Civ. Code
§ 1770(a)(14): By requiring consumer guests to agree to an
unenforceable naked class action waiver as a condition of applying
for the DAS accommodation, WDPR represented that the transaction
(accessing the park and its accommodations) involved a waiver of
rights (the right to collective legal action for systemic violations)

which is prohibited by California public policy in this context, particularly when applied to civil rights and disability access claims.

d.    Inserting unconscionable provisions into the contract (Terms and Conditions), in violation of Cal. Civ. Code § 1770(a)(19): WDPR included substantively and procedurally unconscionable provisions in its DAS Terms and Conditions, which disabled consumers were required to accept before even applying for the DAS accommodation. These include the naked class action waiver, which attempted to immunize WDPR from accountability for widespread misconduct without providing any alternative forum like arbitration, and potentially other one-sided terms like the unilateral right to change terms without notice. These terms were presented on a take-it-or-leave-it basis, exploiting the unequal bargaining power between WDPR and disabled guests needing access, rendering them unconscionable.

201.    On December 19, 2024, Plaintiff, Trisha Malone, through her counsel, provided Defendants with written notice pursuant to California Civil Code § 1782(a), specifying the violations of the CLRA and demanding corrective action within 30 days. Despite receipt of this notice, Defendants failed to take any meaningful steps to remedy the violations identified. A true and correct copy of this notice letter is attached hereto as Exhibit A.

202.    Following receipt of Plaintiffs' CLRA notice, on or about January 28, 2025, Defendant WDPR modified the language on its public website, including the DAS terms and conditions. While previously stating DAS was intended for "**only** Guests who, due to a developmental disability like autism or similar...", WDPR quietly removed the word "**only**," changing the description to read substantially: "DAS is intended to accommodate Guests who, due to a developmental disability like autism or similar...".

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES
CASE NO. 8:25-cv-00562-SRM-DFM

203.   This modification, made shortly after receiving Plaintiffs' notice detailing the deceptive and restrictive nature of the policy and its description, constitutes an implicit acknowledgment by WDPR that the prior "only" language was problematic and violated the CLRA. However, this subtle change in descriptive language does not constitute an appropriate correction or remedy under Cal. Civ. Code § 1782. It fails to address the ongoing harm caused by the underlying restrictive policy application, does not cure the deceptive nature of the initial policy rollout and its impact on consumers who purchased access based on prior understandings, and does not remedy the harm suffered by Plaintiffs Malone, Arballo, Horne and other consumer class member guests. Furthermore, this post-notice modification serves as further evidence that WDPR's prior use of the explicit restrictive language ("only") was a deliberate choice constituting a deceptive or unfair practice under § 1770. Defendant WDPR otherwise failed to provide appropriate correction, repair, replacement, or other remedy within 30 days of receiving the notice, nor has it agreed to do so.

204.   Furthermore, WDPR presented this standalone class action waiver within the DAS Terms and Conditions without including any corresponding arbitration agreement or referencing any potentially applicable arbitration clause from other agreements (such as those for Magic Key passes or park tickets). This omission was deceptive, misrepresenting the nature and context of the rights consumers were purportedly waiving under § 1770(a)(5). WDPR's decision to present this class action waiver exclusively to individuals with disabilities seeking the DAS accommodation in isolation created a misleading impression. This approach implied that the waiver was the sole governing document for dispute resolution related to DAS access. However, it neglected to offer the balanced procedural alternative commonly associated with enforceable class action waivers, which is arbitration.

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES
CASE NO. 8:25-cv-00562-SRM-DFM

205.   This reinforces the unconscionability of the "naked" waiver under § 1770(a)(19). Given its unconscionable nature and the deceptive manner in which it was presented, separate from any potential arbitration context within the DAS agreement itself, Plaintiffs contend this specific DAS class action waiver provision must be severed from the DAS Terms and Conditions and declared void and unenforceable, regardless of whether other agreements signed by Plaintiffs contain arbitration clauses that Defendant might seek to invoke.

206.   As a direct and proximate result of Defendants' conduct, Plaintiff and putative members of the proposed class have suffered damages, including but not limited to emotional distress, inconvenience, and the denial of access to equitable accommodations.

## EIGHTH CAUSE OF ACTION

### Violation of the Fair Employment and Housing Act – Intentional Disability Discrimination (Cal. Gov. Code § 12940(a))

### (Against Defendants Walt Disney Parks and Resorts U.S., Inc., and Does 1-50)

207.   Plaintiffs, Monica Gonzalez and the disabled Disney employee guests' subclass, incorporate by reference all preceding paragraphs as though fully set forth herein.

208.   Defendants Walt Disney Parks and Resorts U.S., Inc. and Does 1 through 5 were, at all relevant times, employers subject to the provisions of the California Fair Employment and Housing Act ("FEHA"), Cal. Gov. Code § 12900 et seq.

209.   Plaintiff Monica Gonzalez and the members of the disabled Disney employee guests' subclass were, at all relevant times, employees of Defendants within the meaning of FEHA. Employee Plaintiffs are individuals with physical or mental disabilities as defined by FEHA, Cal. Gov. Code § 12926.

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES
CASE NO. 8:25-cv-00562-SRM-DFM

210.     Defendants knew that Plaintiff Gonzalez and other disabled Disney employee class member guests had disabilities that limited one or more major life activities.

211.     As a term, condition, or privilege of employment, Defendants provided Plaintiff Gonzalez and other similarly situated disabled Disney employee class members with complimentary theme park admission passes granting access to Disneyland Park and Disney California Adventure Park. These passes constituted a substantial employment benefit, offering meaningful access to the parks as a valued privilege tied directly to their employment with Defendants.

212.     Plaintiff Gonzalez and other disabled Disney employee class member guests were qualified employees, capable of performing the essential functions of their jobs with or without reasonable accommodation.

213.     On or after June 18, 2024, Defendants intentionally designed, implemented, and enforced policies, practices, and eligibility criteria for the Disability Access Service (DAS) program with the purpose and effect of discriminating against Employee Plaintiffs based on their disabilities. Defendants deliberately restricted DAS eligibility primarily to individuals with certain developmental disabilities (e.g., autism or similar conditions), thereby intentionally excluding and denying the necessary DAS accommodation to Employee Plaintiffs whose disabilities prevented them from waiting in conventional queues but did not fit Defendants' arbitrarily narrow and preferred diagnostic categories.

214.     Defendants intentionally denied Plaintiff Gonzalez and other disabled Disney employee class member guests the DAS accommodation based on the type of their disability, rather than their functional limitations and need for accommodation. This constitutes intentional discrimination and resulted in adverse employment actions, deliberately limiting Employee Plaintiffs' ability to access and utilize the theme park admission passes provided as a benefit and privilege of

their employment on equal terms with non-disabled employees or employees with disabilities favored by Defendants' discriminatory criteria.

215.    Defendants' intentional actions in designing, implementing, and applying these restrictive and discriminatory DAS eligibility criteria to Plaintiff Gonzalez and other disabled Disney employee class member guests constitute willful and intentional discrimination in the terms, conditions, or privileges of employment because of physical or mental disability, in direct violation of FEHA, California Government Code § 12940(a).

216.    Defendants undertook these discriminatory actions knowingly and with conscious disregard for the rights of Plaintiff Gonzalez and other disabled Disney employee class member guests, rendering their conduct oppressive and malicious within the meaning of California Civil Code § 3294.

217.    As a direct and proximate result of Defendants' intentional and unlawful discriminatory conduct, Plaintiff Gonzalez and other disabled Disney employee class member guests have suffered and continue to suffer significant harm, including, but not limited to, the denial of equal access to employment benefits and privileges, substantial emotional distress, humiliation, anxiety, frustration, and other compensable damages.

218.    Employee Plaintiffs seek all remedies available under FEHA for intentional discrimination, including compensatory damages, injunctive relief ordering Defendants to cease their discriminatory practices and implement lawful, non-discriminatory DAS policies for employees, punitive damages, attorneys' fees, and costs of suit.

## NINTH CAUSE OF ACTION

### Violation of the Fair Employment and Housing Act – Disparate Impact Disability Discrimination (Cal. Gov. Code § 12940(a)) (Against Defendants Walt Disney Parks and Resorts U.S., Inc., and Does 1-50)

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES
CASE NO. 8:25-cv-00562-SRM-DFM

219.     Plaintiffs Monica Gonzalez incorporate by reference all preceding paragraphs as though fully set forth herein.

220.     Defendants Walt Disney Parks and Resorts U.S., Inc. and Does 1 through 5 were, at all relevant times, employers subject to the provisions of the California Fair Employment and Housing Act ("FEHA"), Cal. Gov. Code § 12900 et seq.

221.     Plaintiff Monica Gonzalez and other disabled Disney employee class member guests were, at all relevant times, employees of Defendants within the meaning of FEHA, and are individuals with physical or mental disabilities as defined by FEHA, Cal. Gov. Code § 12926.

222.     As a term, condition, or privilege of their employment, Defendants provided Plaintiff Gonzalez and other disabled Disney employee class member guests with theme park admission passes, enabling access to Disneyland Park and/or Disney California Adventure Park.

223.     On or after June 18, 2024, Defendants utilized specific policies, practices, and eligibility criteria related to the administration of the Disability Access Service (DAS) program for employees using their employment-provided park passes. These policies and criteria included, but were not limited to, restricting DAS eligibility primarily to individuals with specific developmental disabilities (e.g., autism or similar conditions).

224.     Although facially neutral, Defendants' DAS eligibility policies, practices, and criteria have had a significant disparate adverse impact on Plaintiff Gonzalez and other disabled Disney employee class member guests based on their disabilities. Specifically, these policies and criteria disproportionately screen out and deny the necessary DAS accommodation to employees whose disabilities prevent them from waiting in conventional queues but do not fall within defendant Disney's narrowly defined categories, compared to non-disabled employees or employees whose disabilities meet the narrow criteria.

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES
CASE NO. 8:25-cv-00562-SRM-DFM

225.    The disparate impact of these policies, practices, and criteria adversely affects the terms, conditions, or privileges of employment for Plaintiff Gonzalez and other disabled Disney employee class member guests by denying them equal access to, and enjoyment of, the theme park admission benefit provided by Disney.

226.    The challenged DAS eligibility policies, practices, and criteria utilized by Disney are not job-related for the positions held by Plaintiff Gonzalez and other disabled Disney employee class member guests and are not consistent with business necessity. Furthermore, less discriminatory alternative policies or practices existed or exist that would achieve Disney's purported goals, if any, without imposing such a significant adverse impact on Plaintiff Gonzalez and other disabled Disney employee class member guests based on disability (as mentioned above). Disney failed to adopt such less discriminatory alternatives.

227.    Disney's use of these policies, practices, and criteria constitutes unlawful discrimination based on disparate impact in the terms, conditions, or privileges of employment because of physical or mental disability, in violation of FEHA, California Government Code § 12940(a).

228.    Plaintiff Monica Gonzalez exhausted hers and other disabled Disney employee class member guests' administrative remedies as required by the California Fair Employment and Housing Act ("FEHA"). On April 3, 2025, Plaintiff Gonzalez timely filed a verified complaint alleging discrimination and failure to accommodate based on disability against Disney with the California Civil Rights Department ("CRD"). Subsequently,

229.    Plaintiff Gonzalez received a Notice of Right-to-Sue from the CRD, a true and correct copy of which is attached hereto as Exhibit B. Plaintiff Gonzalez's administrative complaint and resulting Right-to-Sue notice satisfy the administrative exhaustion prerequisites under FEHA for herself and all members of the FEHA Employee Subclass she seeks to represent in this action.

230.    As a direct and proximate result of Disney's unlawful discriminatory conduct, Plaintiff Gonzalez and other disabled Disney employee class member guests have suffered and continue to suffer harm, including, but not limited to, the denial of equal access to employment benefits and privileges, emotional distress, humiliation, frustration, and other damages.

231.    Plaintiff Gonzalez and other disabled Disney employee class member guests seek all remedies available under FEHA, including compensatory damages, injunctive relief ordering Defendants to cease utilizing the discriminatory policies and practices and implement lawful, non-discriminatory DAS policies for employees, attorneys' fees, and costs of suit.

## **TENTH CAUSE OF ACTION**

### **Violation of California Labor Code § 432.6**

### **(Against Defendants Walt Disney Parks and Resorts U.S., Inc., and Does 1-50)**

232.    Plaintiffs Monica Gonzalez and the Disney employee Subclass incorporate by reference all preceding paragraphs as though fully set forth herein.

233.    At all relevant times, Defendants Walt Disney Parks and Resorts U.S., Inc., and Does 1-5 were employers of Plaintiff Monica Gonzalez and the members of the Disney employee subclass within the meaning of California Labor Code § 432.6.

234.    As alleged herein, WDPR provided Ms. Gonzalez and other Disney employees with complimentary theme park admission passes as a benefit of their employment. For WDPR employees whose disabilities prevent waiting in conventional queues, the Disability Access Service (DAS) accommodation is necessary to meaningfully access and receive the full value of this employment benefit.

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES
CASE NO. 8:25-cv-00562-SRM-DFM

235.    As a mandatory condition precedent to applying for the necessary DAS accommodation, WDPR required Ms. Gonzales and other Disney employee class members to agree to the DAS Terms and Conditions.

236.    Said DAS Terms and Conditions contained provisions that required Ms. Gonzalez and other employee class members to waive rights and procedures related to potential violations of the California Fair Employment and Housing Act (FEHA), including the right to pursue class or representative actions in court.

237.    California Labor Code § 432.6(a) provides that

*a person shall not, as a condition of employment, continued employment, <u>or the receipt of any employment-related benefit</u>, require any applicant for employment or any employee to waive any right, forum, or procedure for a violation of any provision of the California Fair Employment and Housing Act... or this code, including the right to file and pursue a civil action or a complaint with, or otherwise notify, any state agency, other public prosecutor, law enforcement agency, or any court or other governmental entity of any alleged violation.*

238.    By requiring Ms. Gonzalez and other WDPR employees to agree to waive their rights to pursue class or representative actions as a condition of applying for the DAS accommodation, which is necessary for the receipt and enjoyment of their employment-related benefit (park passes), Defendants WDPR and Does 1 through 50 violated California Labor Code § 432.6.

239.    As alleged previously, the specific DAS Terms and Conditions containing this unlawful waiver do not include an arbitration agreement, rendering the waiver void under California law and not subject to preemption by the Federal Arbitration Act.

240.    As a direct and proximate result of Defendants' violation of Labor Code § 432.6, Plaintiff Gonzalez and other disabled Disney employee class member guests were subjected to an unlawful condition for receiving their

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES
CASE NO. 8:25-cv-00562-SRM-DFM

employment benefit and were required to agree to void and unenforceable terms, causing them harm.

241.     Ms. Gonzalez and other WDPR employees are entitled to appropriate relief for this violation, including declaratory relief that the waiver provision is void, injunctive relief prohibiting Defendants from enforcing such waivers as a condition of employment benefits, and other remedies including attorneys' fees and costs pursuant to applicable statutes.

**ELEVENTH CAUSE OF ACTION**

**Violation of FEHA - Unlawful Employment Practice (Cal. Gov. Code § 12953)**

**(Against Defendants Walt Disney Parks and Resorts U.S., Inc., and Does 1-50)**

242.     Plaintiffs Monica Gonzalez and the Disney employee subclass incorporate by reference all preceding paragraphs as though fully set forth herein.

243.     At all relevant times, Defendants Walt Disney Parks and Resorts U.S., Inc., and Does 1-5 were employers subject to the provisions of the California Fair Employment and Housing Act ("FEHA").

244.     California Government Code § 12953 states that it is an unlawful employment practice for an employer to violate Section 432.6 of the Labor Code.

245.     As alleged in the preceding Ninth Cause of Action, Defendants WDPR and Does 1 through 5 violated California Labor Code § 432.6 by requiring Plaintiff Monica Gonzalez and the members of the Disney employee subclass, as a condition of receiving an employment-related benefit (access to theme parks via complimentary passes, enabled by the necessary DAS accommodation), to agree to waive rights and procedures under FEHA, including the right to pursue class or representative court actions, through the mandatory acceptance of the DAS Terms and Conditions.

246.    By violating Labor Code § 432.6 as alleged herein, Defendants WDPR and Does 1 through 50 committed an unlawful employment practice under FEHA pursuant to Government Code § 12953.

247.    As a direct and proximate result of Defendants' WDPR and Does 1 through 5 unlawful employment practice in violation of Government Code § 12953, Ms. Gonzalez and other Disney employee subclass members were subjected to unlawful requirements affecting their employment benefits and statutory rights, causing them harm.

248.    Ms. Gonzalez and other Disney employee subclass members seek all remedies available under FEHA for this unlawful employment practice, including declaratory relief, injunctive relief, compensatory damages, punitive damages, attorneys' fees, and costs of suit.

## PRAYER FOR RELIEF

Plaintiff, on behalf of herself and all others similarly situated, pray for judgment as follows:

1. Certification of the proposed class and subclasses;

2. Declaratory relief stating that Defendants' policies violate the Unruh Act, CMIA, and California law;

3. Injunctive relief requiring Defendants to revise the DAS program to comply with California law, eliminate restrictive and misleading eligibility criteria, and ensure equitable access to individuals with disabilities;

4. Statutory damages under the Unruh Act, CLRA and CMIA;

5. Restitution and disgorgement of profits under California Business and Professions Code § 17200;

6. Attorneys' fees and costs; and

7. Any other relief the Court deems just and proper.

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES
CASE NO. 8:25-cv-00562-SRM-DFM

1

2  DATED: April 4, 2025,                    Respectfully submitted,

3

4

5                                    **MCCUNE LAW GROUP, APC**

6

7                                    By:   *Gavin P. Kassel*

8                                    Michele M. Vercoski
                                     Yasmin N. Younessi
9                                    Gavin P. Kassel
10                                   Attorneys for Plaintiffs'

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES
CASE NO. 8:25-cv-00562-SRM-DFM